# Wytheville.

## HEYWOOD FORTUNE v. COMMONWEALTH.

### June 15, 1922.

1. HOMICIDE—*Depositions Taken Before Coroner—Objection by Common-wealth that Depositions Were Inaccurate—Case at Bar.*—Upon a trial for homicide, accused, after laying the foundation therefor as required by statute (section 6216 of the Code of 1919)*, asked leave of the trial court to introduce the depositions of two witnesses for the Commonwealth before the coroner, reduced to writing by an amanuensis present at the time, and then and there read to the witnesses, who authorized the coroner, according to his testimony, to sign their names thereto as their depositions, for the purpose of contradicting the testimony of those witnesses. The court, upon the objection of the attorney for the Commonwealth to the accuracy of the depositions, refused to admit the depositions in evidence.
   *Held:* Error.

2. HOMICIDE—*Depositions Taken Before Coroner—Objection by Common-wealth that Depositions Were Inaccurate.*—The mere objection by the Commonwealth's attorney that depositions of witnesses for the Commonwealth taken before the coroner and sought to be introduced to contradict the witnesses were inaccurate was not sufficient to establish the fact that the depositions were inaccurate. Absolute accuracy was not essential to their admission in evidence. How accurate or inaccurate they were was a question which was open for testimony pro and con, and went merely to the weight to be given them by the jury, and not to their admissibility in evidence.

3. HOMICIDE—*Admissibility of Depositions Taken Before Coroner—Authentication of Depositions.*—In a prosecution for homicide depositions of the Commonwealth's witnesses taken before the coroner, who testified that the depositions were written out by an amanuensis present at the time, and were then and there read over to the witnesses, who authorized the coroner to sign their names to the depositions, were sufficiently authenticated to make them at least *prima facie* evidence of the testimony of these witnesses as given at the inquest. And the accused was entitled to have the jury consider whether such depositions, subject to such impeachment of their accuracy as the Commonwealth could produce, affected the credibility of the testimony of these witnesses on the trial, and, if so, to what extent?

4. HOMICIDE—*Admissibility of Depositions Taken Before Coroner—Cumulative Evidence—Harmless Error.*—On a prosecution for homicide

the accused sought to impeach the testimony of two witnesses for the Commonwealth by their depositions taken at the coroner's inquest. The trial court refused to admit the depositions, and the Commonwealth contended that if this refusal was error it was harmless, as accused had successfully impeached one of these witnesses on the subject in question by other testimony.

*Held:* That this position overlooked the facts that the accused had the right to introduce the depositions as bearing upon the credibility of the other witness, and that the depositions under oath constituted a different character of evidence from the other impeaching testimony, and, hence, was not merely cumulative.

5. HOMICIDE — *Witnesses — Cross-Examination — Collateral Matter Upon Which Answer of Witness is Conclusive.*—On a prosecution for homicide the court erred in ruling that the testimony of a witness, in answer to a question by counsel for the accused on cross-examination, denying that the coroner had verified the deposition of the witness given at the inquest by going over it with the witness at the time, and asking him if it was correct, was collateral matter upon which the answer of the witness was conclusive upon the accused, so that the truth of such testimony could not be inquired into, and in excluding the testimony of the coroner to the contrary.

6. WITNESSES—*Cross-Examination—Collateral Matter Upon Which Answer of Witness is Conclusive.*—A party is bound by the answer of a witness · to a question on cross-examination upon a collateral matter, and cannot contradict the witness. But this rule does not extend to cross-examination upon facts material to the issue.

7. HOMICIDE—*Duty to Retreat—Self-Defense—Defense of the Curtilage—Defense of Home.*—A man upon his own premises when attacked is under no duty to retreat, but may resist the aggressor, and in doing so may use such force as appears to him as a prudent man reasonably necessary to repel the attack, but not such force as may be necessary to subdue the aggressor or compel him to leave the premises.

8. HOMICIDE—*Duty to Retreat—Self-Defense—Defense of the Curtilage—Defense of Home.*—One in his own curtilage, who is free from fault in bringing on the combat, when attacked by another, has the same right of conduct, without any retreat (*i. e.*, to stand at bay and resist assault), even to the taking of life, that one has when within his own home.

9. HOMICIDE—*Duty to Retreat—Self-Defense—Defense of the Curtilage—Defense of Home.*—But in no case, even within one's own home or curtilage, is a person wholly justified in taking the life of another who has entered the home or curtilage peaceably, on an implied license, merely to punish or subdue him, or to compel him to leave the premises, where there is no apparent intent on the part of the latter to commit any felony.

10. HOMICIDE—*Defense of Home—Duty to Retreat.*—A man is not obliged to retreat if assaulted in his dwelling, but may use such means as are absolutely necessary to repel the assailant from his house or prevent his forcible entry, even to the taking of life.

11. HOMICIDE—*Defense of Home—Defense of the Curtilage—Ordering De-ceased from Premises—Instructions—Case at Bar.*—In the instant case there was no evidence tending to show that the deceased entered the premises of the accused by force. He was there by permission of the accused. His subsequent conduct, granting that it was misconduct, did not justify his killing by accused, unless that conduct was such as to justify it on the part of the accused under the settled doctrine of self-defense. Therefore, none of the instructions in the case should have been predicated upon the existence or non-existence of the circumstance of the ordering of the deceased off the premises, since that was an immaterial circumstance so far as the instant case was concerned, and could serve no purpose but to mislead the jury, unless they were more fully instructed on that subject than they were.

12. HOMICIDE—*Instructions—Self-Defense.*—On a prosecution for homicide the trial court refused to give the following instructions at the request of accused: "If one who is free from fault in bringing on the difficulty is attacked by another upon his own premises in such a manner as would raise in a reasonable mind the belief that he is in imminent danger of great bodily harm, and he is so impressed, he is not under any obligation to retreat, but may take the life of his assailant and be justified under the law."

   *Held:* That while the instruction as an abstract proposition of law was correct, it was so general in its terms as to be open to miscon-ception, and was not sufficiently specific in pointing out that the right to kill under the circumstances mentioned begins and ends with the apparent necessity therefor in order to protect the accused from death or great bodily harm.

13. HOMICIDE—*Instructions—Self-Defense—Circumstances as They Reason-ably Appeared to Accused at the Time of the Homicide.*—A man when assaulted is held accountable under the law only for the exercise of such judgment as is warranted by the circumstances as they reasonably appear to him at the time. The test is not what a reasonable man similarly situated would have believed, but what the accused actually believed.

14. HOMICIDE—*Self-Defense—Refusal of Instruction Held Error.*—On a prosecution for homicide, the refusal of the following instruction was held error: "If the jury believe from the evidence in this case that the defendant was assaulted by the deceased with such violence as to make it appear to the defendant at the time that the deceased manifestly intended and endeavored to take his life or do him some great bodily harm, and that the danger was imminent and impending, then, in that case, the defendant was not bound to retreat, but had the right to stand his ground, repel force with force, and, if need be, kill his adversary to save his own life or prevent his receiving great bodily injury, and it is not necessary that it shall appear to the jury to have been necessary."

15. HOMICIDE—*Self-Defense—Instructions—Situation of Accused.*—An in-struction upon self-defense is erroneous, which bases the justification

for the action of the accused solely upon the abstract proposition of what a reasonable man similarly situated would have believed, omitting all provision with respect to what. the accused actually believed, and with respect to what was his actual motive in killing the deceased. And while this might have been harmless error as being more favorable to the accused than he was entitled, yet this is not so when the instruction was so linked with another instruction as to be plainly calculated to mislead the jury, in that it diverted their minds from the consideration of what was the actual motive of the accused as deduced from the situation and the circumstances as they reasonably appeared to him at the time.

16. *Instructions—Repetition.*—Where a requested instruction embodied the same legal principle as that which was embraced and more clearly expressed in an instruction given, its refusal is not error.

17. HOMICIDE—*Instructions—Self-Defense—Existence of Danger.*—On a prosecution for homicide it is error for the trial court to refuse to instruct the jury that "it is not essential to the right of self-defense that the danger should in fact exist."

18. HOMICIDE—*Conflict in Instructions—Justifiable Homicide.*—On a prosecution for homicide the court instructed the jury that the issue which they were trying was whether the killing of deceased by accused was justifiable or not. The word "justifiable" without qualification carries the meaning of entirely or wholly justifiable. The instruction, therefore, withdrew from the jury all consideration of the subject of whether the killing, although not wholly justifiable, amounted only to voluntary manslaughter. And although another instruction defined voluntary manslaughter, the initial instruction in effect told the jury that this was not a subject which they could consider; so that, at least, there was a conflict in the instructions which was likely to have misled the jury.

19. HOMICIDE—*Self-Defense—Apparent or Actual Necessity—Instructions.*—On a prosecution for homicide, where the defense is self-defense, an instruction which makes the justification of the killing depend entirely upon the actual necessity therefor to prevent death or great bodily harm to accused, wholly ignoring the settled doctrine that a necessity reasonably regarded as real by the actor, who vouches it as inducing his action, is regarded as in fact real, sets up a wrong standard for the jury on the subject, and the error is not cured by another instruction stating that the homicide would be justifiable if a reasonable man similarly situated would have believed that he was in imminent danger of death or serious bodily injury, and it was necessary to kill the deceased to protect himself.

Error to a judgment of the Corporation Court of the city of Lynchburg.

*Reversed and new trial granted.*

There were two trials of this case, the first resulting in a hung jury, the second in a verdict finding the accused, Heywood Fortune, guilty of murder in the second degree and fixing his punishment at eight years in the penitentiary.    The judgment under review was entered accordingly.

Prior to the homicide the deceased, John Bays, had gotten eggs from the accused for setting purposes from time to time, they had also had dealings about chickens and the relations between them were friendly.    The homicide occurred on April 27th, between half past seven and eight o'clock p. m.    The deceased accompanied by one Will Hamlett, a brother-in-law, went to the home of the accused for the purpose of getting more eggs from the latter.    On their arrival they called to the accused to come out.    The latter was at supper at the time, called back that he would come out in a few minutes, and the deceased and his companion passed along the side of the house, and went into the yard back of the residence of the accused and awaited the coming of the latter out of the house.    In a short time the accused finished his supper and came out into the back yard, where the deceased and Will Hamlett were standing near the chicken house of the accused.    The accused and the deceased greeted each other pleasantly, but upon the want of the deceased to obtain more eggs being made known to the accused he refused to let the deceased have any more eggs, stating that the latter already owed him.    The deceased denied owing the accused anything.    Thereupon there was an angry and mutually insulting interchange of words between them, followed by the accused drawing a pistol and firing three shots at the deceased, two of which took effect, one penetrating the head, entering in the forehead, just above the left eye, and the other the body

43

of the deceased, entering his left breast. Both were mortal wounds and the deceased expired in a few minutes. There was an appreciable interval between the first shot and the two shots following.

There were only three eyewitnesses of the occurrence besides the deceased, namely, Will Hamlett, the accused, and his housekeeper, Sallie Cail. The last named did not, however, see the actual shooting, but testified as to what occurred immediately preceding the firing of the first shot. Will Hamlett testified as a witness for the Commonwealth, Sallie Cail for the accused, and the latter took the stand as a witness in his own behalf. There was a sharp conflict between the testimony for the Commonwealth and that for the accused on the subject of the provocation for the shooting.

The testimony of Will Hamlett was to the effect that the accused began the angry controversy by calling the deceased a damn liar, that the deceased merely "told him he was another;" that when the accused added still more insulting epithets, the deceased merely replied to each that "he was another;" that then the shooting started; that the accused did not tell the deceased to get off the premises; that witness saw the first shot, following which the deceased fell; that witness then turned his head and did not see the two other shots; that the deceased did not throw a rock at the accused, but had both hands in his pockets when the first shot was fired and made no motion to advance on the accused; and that no rock was thrown by the deceased. The testimony of the housekeeper and the accused is somewhat confused and conflicting as to precisely what occurred; but their testimony, taken together, is to the effect that the deceased was the aggressor in the use of insulting language; that the

accused in the midst of the angry altercation ordered the deceased off the premises; that this order was unheeded, and that the deceased thereupon advanced upon the accused in a threatening manner, threw a rock at the accused, just before, or was about to throw it as the first shot was fired, and was getting up as the accused supposed, with, or was about to get another rock, with the purpose of throwing it at the accused, when the last two shots were fired.

Will Hamlett, in his testimony on the trial, admitted that a few hours after the shooting he stated, in the presence of the accused and several other persons, that the deceased threw a rock at the accused, but claimed that he made this statement because the accused forced him to do so.    That what forced him to do this was that the accused had told him that "it wouldn't be good" for him if he did not make this statement, and that the accused still had the pistol in his hand when witness made the statement.    And he denied that he had made this statement at any other time.    Several witnesses for the accused contradicted the denial of Will Hamlett just mentioned.

The widow of the deceased, also a witness for the Commonwealth, testified on the trial that Will Hamlett came to her house the night of the shooting and told her that the accused had forced him to say that the deceased "was throwing rocks."    The testimony of Will Hamlett on the trial was to the same effect on this point.

There was a coroner's inquest, the next day after the homicide, at which Will Hamlett and the widow of the deceased testified.    The coroner, after having testified as a witness for the Commonwealth, was called as a witness for the accused on the subject of what testimony was given by Will Hamlett and the widow before

him at the inquest.   He testified that these witnesses
did testify before him at the inquest.   That their
depositions were written out by an amanuensis present
at the time and were then and there read over to the
witnesses who authorized him (the coroner) to sign
their names to the depositions as their depositions,
which he (the coroner) then and there did, they touching
the pen.   As set forth in this deposition of the widow,
it appears that she testified before the coroner that
"Will (Hamlett) told us that John (the deceased)
throwed a rock at Mr. Fortune first and then Mr.
Fortune shot him," making no mention of Will Hamlett
having said that he made this statement because
forced to do so by the accused; and as set forth in the
deposition of Will Hamlett before the coroner, he was
asked, "Did John (the deceased) make any effort to
hit Mr. Fortune?"   He answered: "If he did I didn't
see him, I was looking over in the chicken pen."   It
does not appear in this deposition that he was asked
or made any statement about the rock throwing or
about his having been forced by the accused to make
any statement about it.   The accused, by counsel,
after laying the foundation therefor as required by
statute (sec. 6216 Code, 1919), asked leave of the trial
court to introduce the depositions aforesaid in evidence
for the purpose of contradicting the testimony aforesaid
of Will Hamlett and of the said widow on the subject
of the rock throwing.   The court, upon the objec-
tion of the attorney for the Commonwealth to their
accuracy, refused to admit the depositions in evidence,
but ruled that the accused might prove by the coroner
what the witnesses testified to before him, if the
coroner could testify thereto from his recollection
without the aid of reference to the depositions.   The
coroner, however, testified that he could not remember

the testimony without reference to the transcript of the testimony contained in the depositions. Whereupon the court ruled that the coroner could refer to the depositions and state whether or not Will Hamlett and the said widow made before him at the inquest any statement with respect to the rock throwing contradictory to their testimony on the trial of the case; that this was all the coroner could testify to. Whereupon no further questions were asked the coroner by counsel for the accused and the coroner left the witness stand.

Thereupon Will Hamlett was recalled to the witness stand and in answer to a question on cross-examination denied that the coroner "had gone over his testimony at the coroner's inquest and asked him if it was correct," and the court held that this was collateral matter upon which the answer of the witness to the question was conclusive upon the accused, so that the truth of the answer could not be inquired into, and the court thereupon excluded all of the testimony of the coroner on the subject of the depositions aforesaid.

The court refused to give the following instruction asked for by the accused:

### DEFENDANT'S INSTRUCTIONS REFUSED.

"4. A man upon his own premises when attacked is under no duty to retreat but may resist the aggressor and in so doing may use such force as appears to him as a prudent man reasonably necessary to repel the attack and to subdue the aggressor or compel him to leave the premises.

"5. A man when assaulted is held accountable under the law only for the exercise of such judgment as is warranted by the circumstances as they reasonably appear to him at the time.

"6. If one who is free from fault in bringing on the difficulty is attacked by another upon his own premises in such a manner as would raise in a reasonable mind the belief that he is in imminent danger of great bodily harm, and he is so impressed, he is not under any obligation to retreat but may take the life of his assailant and be justified under the law.

"7. If the jury believe from the evidence in this case that the defendant was assaulted by the deceased with such violence as to make it appear to the defendant at the time that the deceased manifestly intended and endeavored to take his life or do him some great bodily harm and that the danger was imminent and impending, then in that case the defendant was not bound to retreat but had the right to stand his ground, repel force with force and if need be kill his adversary to save his own life or prevent his receiving great bodily injury, and it is not necessary that it shall appear to the jury to have been necessary.

"8. If the jury from the evidence have a reasonable doubt as to whether the defendant had reason to believe as a reasonable man, that he was in danger of being killed or seriously injured by the deceased at the time he shot the deceased, then the jury should find the accused not guilty.

"9. The court instructs the jury that it is not essential to the right of self-defense that the danger should in fact exist.

"If to the defendant it reasonably appeared that the danger in fact existed he had the right to defend against it to the same extent and under the same rules which would obtain in case the danger had been real.

"The defendant may always act upon reasonable appearance of danger, and whether the danger is apparent or not is always to be determined from the

standpoint from which the defendant viewed it at the time he acted.

"10. If the jury believe from the evidence that on the evening the date alleged in the indictment the deceased came with a companion upon the premises of the accused and into the back yard of his residence, that while there a quarrel arose between the deceased and the accused, that the deceased was ordered by the accused to leave the premises, that the deceased did not do so but instead, without being himself assaulted, seized and threw a rock at the accused and then advanced upon him with threats and gestures reasonably giving the accused cause to believe that he was in danger of death or serious bodily harm, that the accused did so reasonably believe and in what he believed the necessary defense of himself shot the deceased, they should find the accused not guilty."

The court thereupon gave the following instructions:

## INSTRUCTIONS GIVEN.

"The court instructs the jury that the issue which they are trying is whether the killing of John Bays by Heywood Fortune was justifiable or not.

"The following instructions set forth the law applicable to the the case:

## "No. 1.

"Any willful, deliberate or premeditated killing of a human being is murder of the first degree.    All other murder is murder of the second degree.

"Voluntary manslaughter is unlawful homicide done in heat of sudden passion caused by adequate provocation and not from malice.

"No. 2.

"The prisoner enters upon his trial presumed to be innocent and the burden of proof is upon the Commonwealth to establish his guilt by evidence beyond a reasonable doubt, but if it is proven that the prisoner killed John Bays, the law presumes that the prisoner is guilty of murder in the second degree, and in order to elevate the offense to murder in the first degree, the burden is on the Commonwealth, but, on the other hand, the burden is on the prisoner to show by evidence the absence of malice, or that the killing was done in self-defence.

"No. 3.

"The court instructs the jury that if they believe from the evidence that the prisoner gave the deceased a mortal wound with a pistol in his previous possession, without any or upon slight provocation, then the killing of the deceased was *prima facie* murder in the first degree, throwing on the prisoner the necessity of proving extenuating circumstances.

"No. 4.

"If, upon the whole evidence or any part thereof necessary to establish the guilt of the prisoner, or the degree of his crime, the jury have a reasonable doubt, they should give him the benefit of the doubt.

"No. 5.

"That to constitute willful, deliberate or premeditated murder it is not necessary that the deliberation or premeditation should exist for any particular length

of time—it is only necessary that such intention should come into existence for the first time at the time of the killing, or at any time previous to the killing.

### "No. 6.

"That words, however grievous, will not justify an assault.

### "No. 7.

"That if they believe from the evidence that a quarrel arose between the prisoner and the deceased, that prisoner was without fault in provoking the assault, that the accused ordered the deceased to leave his premises, which he did not do, that the deceased, without being himself assaulted, seized and threw a rock at the accused, and then advanced upon him with such violent threats and gestures that a reasonable man similarly situated would have believed that he was in imminent danger of death or serious bodily injury and that it was then and there necessary to kill the deceased to protect himself from death or serious bodily injury from said assault, then such killing was justifiable and they should find the prisoner not guilty.

### "No. 8.

"That the law of self-defense is the law of necessity, and if they believe from the evidence that after the deceased had thrown the rock which did not strike the accused, and was advancing towards him, the deceased had no other weapon, and that a reasonable man similarly situated and armed as was the accused, would have used other less violent means to protect himself from said assault or that the danger of death

or serious bodily injury from said assault was not so imminent that the killing of the deceased was then and there necessary for his protection, then said homicide was not justifiable and they should find the prisoner guilty.

"No. 9.

."The court instructs the jury that the proof that a witness made contradictory statements is for the purpose alone of impeachment of the veracity of the witness, and does not give such statements the effect of evidence. Therefore the statements of the witnesses, the Gunters and the Harrises, as to what was told them by Sallie Cail, would not be evidence against the prisoner, nor would the statements made by the witnesses to impeach Caddie Bays or Will Hamlett be evidence for the prisoner."

*Aubrey E. Strode,* for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

There is one assignment of error touching a remark of the learned trial judge before the jury during the trial, which we need not deal with, as the case must be reversed on other grounds and no occasion for such a remark is likely to arise on a new trial.

The question presented by the remaining assignments of error will be disposed of in their order as stated below.

[1] 1. Did the court, upon the mere objection of the attorney for the Commonwealth to their accuracy, err in refusing to admit in evidence the depositions of Will Hamlett and of the widow of the deceased before the coroner at the inquest, as reduced to writing by an amanuensis present at the time, then and there read over to the witnesses, who authorized the coroner, according to his testimony, to sign their names thereto as their depositions and who then and there accordingly signed such names to the depositions?

This question must be answered in the affirmative.

Two positions are taken by the Attorney-General on this subject:

[2] First: It is urged that the court committed no error in refusing to admit the depositions in evidence upon the attorney for the Commonwealth making objection to their accuracy.

Such mere objection was not sufficient to establish the fact that the depositions were inaccurate.    Indeed, absolute accuracy was not essential to their admission in evidence.    How accurate or inaccurate they were was a question which was open for testimony pro and con and went merely to the weight to be given them by the jury and not to their admissibility in evidence.

[3, 4] The testimony of the coroner on the subject was sufficient to authenticate the depositions so as to make them at least *prima facie* evidence of the testimony of these witnesses as given at the inquest.    And the accused was entitled to have the jury consider whether such depositions, subject to such impeachment of their accuracy as the Commonwealth could produce, affected the credibility of the testimony of these witnesses, or either of them, on the trial, and, if so, to what extent. *Wormley's Case, 10 Gratt.* (51 Va.) 658, 688-9; *N. Y., P. & N. R. R. Co.* v. *Kellam,* 83 Va. 851, 860, 3 S. E. 703.

Secondly: It is urged that, as several witnesses were introduced for the accused who contradicted Will Hamlett in his testimony on the trial, to the effect that he had never made the statement as to the rock throwing at any other time than upon the occasion a few hours after the homicide, when he claimed the accused forced him to do so, the accused had successfully impeached the witness Hamlett on this subject without the aid of the depositions aforesaid, and, hence, the accused was not hurt by the refusal of the court to admit the depositions in evidence, so that if that action of the court was error, it was harmless error.

This position, however, does not at all reach the consideration that the accused had the right to introduce the depositions as bearing upon the credibility of the widow. And, as bearing upon the credibility of Will Hamlett, the depositions under oath constituted a different character of evidence from the other impeaching testimony aforesaid, and, hence, was not merely cumulative, so that it cannot be said to have been harmless error to refuse to admit this evidence, even as to Will Hamlett's credibility on the subject of the rock throwing.

[5, 6] 2. Did the court err in ruling that the testimony of Will Hamlett, in answer to a question by counsel for the accused on cross-examination, denying that the coroner had verified the deposition of the witness given at the inquest by going over it with the witness at the time and asking him if it was correct, was collateral matter upon which the answer of the witness was conclusive upon the accused, so that the truth of such testimony could not be enquired into, as a result of which ruling the court excluded the testimony of the coroner to the contrary?

The question must be answered in the affirmative.

The rule is undoubtedly well settled that a party is bound by the answer of a witness to a question on cross-examination upon a collateral matter. But whether the deposition in question had been verified by the coroner was not a collateral matter in this case. The question of the verification was directly in issue because it involved the weight and effect to be given the deposition as bearing upon the enquiry of whether the testimony of Will Hamlett before the coroner affected the credibility of the testimony of such witness, and also that of the widow, given upon the trial of the case. Therefore the testimony of the coroner in question was material to this issue and should not have been excluded, but should have gone to the jury along with the depositions and the testimony of Will Hamlett on the subject, for their consideration and for their determination of whether certain portions of the testimony of Will Hamlett and of the widow on the trial were true.

As said on one cross-examining a witness, in *Welch v. Insurance Co.*, 23 W. Va. 288, 303: "It is true, if he examined him as to a collateral fact, he must take the answer and cannot contradict it. *Spencely v. DeWillot*, 7 East, 108; *Rex v. Watson*, 2 Stark, R. 116. But this rule does not extend to cross-examination upon facts material to the issue. And he may inquire into other material facts to the issue than those elicited by the party calling the witness, and, if the answers are not satisfactory, he may, by any legal proof, contradict or discredit them. 1 Stark. Ev. 164 (Metc. I. & G. Ed. 1876)."

[7] 3. Did the court err in refusing to give instruction 4, asked for by the accused?

The question must be answered in the negative.

This instruction, as applicable to an attack upon one

within his own curtilage (and the accused was within his own curtilage in the instant case), would have been correct if it had stopped with the word "attack." But the additional language, "and to subdue the aggressor or to compel him to leave the premises," rendered the instruction incorrect.

[8, 9] One, in his own curtilage, who is free from fault in bringing on the combat, when attacked by another, has the same right of conduct, without any retreat (*i. e.* to stand at bay and resist as ault), even to the taking of life, that one has when within his own home. See note to 5 Am. & Eng. Anno. Cas., p. 999 and cases cited, among them *Beard* v. *United States*, 158 U. S. 550, 15 Sup. Ct. Rep. 962, 39 L. Ed. 1086, approved in *Alberty* v. *United States*, 162 U. S. 499, 16 Sup. Ct. Rep. 864, 40 L. Ed. 1051. What force one, on his own premises, may use to eject another therefrom, short of endangering human life or of doing great bodily harm, was the subject of consideration in *Montgomery's Case*, 98 Va. 840, 842-3, 36 S. E. 371; Id., 99 Va. 833, 835-6, 37 S. E. 841. But in no case, even within one's own home, or curtilage, is a person wholly justified in taking the life of another, who has entered the home or curtilage peaceably on an implied license, merely to punish or subdue him or to compel him to leave the premises, where there is no apparent intent on the part of the latter to commit any felony.

[10] As said in 1 Bish. New Cr. Law (8th Ed.), sections 857, 858: "*   *   the general rule is that while a man may use all reasonable and necessary force to defend his real and personal estate, of which he is in the actual possession, against another who comes to dispossess him without right, he cannot innocently carry this defense to the extent of killing the aggressor.

If no other way is open to him, he must yield, and get himself righted by resort to the law.   A seeming exception to this rule is the—

"*Defense of the Castle.*—In the early times our forefathers were compelled to protect themselves in their habitations by converting them into holds of defense: and so the dwelling house was called the castle.   To this condition of things the law has conformed, resulting in the familiar doctrine that while a man keeps the doors of his house closed, no other may break and enter it, except in particular circumstances to make an arrest or the like—cases not within the line of our present exposition.   From this doctrine is derived another: namely, that the persons within the house may exercise all needful force to keep aggressors out, even to the taking of life.   As observed by Campbell, J., in Michigan, 'a man is not obliged to retreat if assaulted in his dwelling, but may use such means as are absolutely necessary to repel the assailant from his house or prevent his forcible entry, even to the taking of life'   *   *  ."

But the same learned work continues, in section 858, as follows:

"1.  *Waiving Castle.*—One may waive the protection of his castle by permitting another to enter;   *.  *."

"2.  *Putting out of the Castle.*—If a man enters another's dwelling house peaceable on an implied license, he cannot be ejected except on request to leave, followed by no more than the necessary and proper force, even though misbehaving himself therein.   *   *   Hence a needless battery, resulting in death, employed in ejecting an intruder from the dwelling-house, will constitute felonious homicide."

[11]  There is no evidence in the case in judgment tending to show that the deceased entered the premises

of the accused by force. He was there, and was greeted in a manner which indicated that he was there by permission of the accused, before the affray began. His subsequent conduct, granting that it was misconduct, did not justify the killing of him, unless that conduct was such as to justify it on the part of the accused under the settled doctrine applicable to the killing of an assailant by one in defence of his own person.

Therefore, none of the instructions in the case should have been predicated upon the existence or non-existence of the circumstance of the ordering of the deceased off the premises, since that is an immaterial circumstance so far as the instant case is concerned and could serve no purpose but to mislead the jury, unless they were more fully instructed on that subject than they were.

*Parrish's Case*, 81 Va. 1, is cited and relied on for the Commonwealth. In that case the court was divided, there being a bare majority of one for the majority opinion. The holding of that opinion on the subject of the relation of Parrish to the deceased cropper is in conflict with *Lowe* v. *Miller*, 3 Gratt. (44 Va.) 205, 46 Am. Dec. 188, not cited in the opinion, and is otherwise, as we think, unsound in its holding with respect to the principles of law applicable to the facts of that case, so that the court, as now constituted, feels constrained to disapprove of such holding. However, of that case this should be said: The decision was placed both on the ground that the killing was done in order to prevent the forcible entry of the assailant into a building within the curtilage, by breaking and entering, and that, too, in the night time (which was held to have been a felony committed in the presence of the accused), and on the ground that the killing was in self-defense.

[12] 4. Did the court err in refusing to give instructions 6 and 10 asked for by the accused?

This question must be answered in the negative.

Instruction 6 is correct as an abstract proposition of law, but it is so general in its terms that it is open to misconception. It is not sufficiently specific in pointing out that the right to kill under the circumstances mentioned begins and ends with the apparent necessity therefor in order to protect the accused from death or great bodily harm. The same principle is covered by and is better expressed in instruction 7, asked for on behalf of the accused.

Instruction 10 contains the reference to the immaterial circumstance of the ordering of the deceased off the premises, which, as aforesaid, could serve no useful purpose except to mislead the jury, unless they were more fully instructed on that subject. With the omission of such reference, this instruction was a proper instruction.

[13-15] 5. Did the court err in refusing to give instructions 5 and 7 asked for by the accused?

This question must be answered in the affirmative.

These instructions correctly stated the law as applicable to the evidence; were proper instructions and should have been given; unless covered by the provisions of the instructions which were given. This does not appear to be the case. Instruction 7, given by the court, is the only instruction which makes any approach to covering the rule of law embodied in the instructions 5 and 7 now under consideration. As we shall see, however, when we come to specifically consider instructions 7 and 8, given by the court, instruction 7, as given, erroneously bases the justification for the action of the accused solely upon the abstract proposition of what a reasonable man similarly situated

would have believed, omitting all provision with respect
to what the accused actually believed and with respect
to what was his actual motive in killing the deceased.
But for instruction 8 this may have been harmless
error, and the refusal of the instructions in question
asked for by the accused might have been harmless
error, if instruction 7 as given had not been accom-
panied by instruction 8; for instruction 7 as given was
more favorable to the accused than he was entitled to
have the jury instructed. Under that instruction,
standing alone, he might have been acquitted although
the jury may have believed from the evidence that he
did not in fact believe that he was in imminent danger
of death or serious bodily harm and did not in fact
shoot the deceased in order to avert that danger. But
when we read instruction 8, given by the court, we
see that it is so linked with instruction 7, as given,
in its reference to the action of the hypothetical reason-
able man mentioned, under the actual, not the reason-
ably apparent circumstances, as to be plainly calculated
to mislead the jury, in that it diverted their minds
from the consideration of what was the actual motive
of the accused as deduced from his situation and the
circumstances as they reasonably appeared to him at
the time, and left the jury wholly uninstructed upon
that important feature of the case, which would have
been correctly covered by instructions 5, 7 and 9, as
asked for by the accused. Hence, instruction 7, as
given, cannot be said to have properly supplied the
place of the instructions 5 and 7 in question.

[16]  6. Did the court err in refusing to give instruc-
tion 8, asked for by the accused?

This question must be answered in the negative.

This instruction embodies the same legal principle as
that which is embraced in instruction No. 4, which was

given by the court. *Litton's Case*, 101 Va. 833, 44 S. E. 923; *Potts' Case*, 113 Va. 732, 73 S. E. 470. The phraseology of the latter instruction was, however, as we think, preferable in that it more clearly expressed the legal principle involved. The court was, therefore, plainly right in using instruction No. 4 in announcing such principle to the jury, in preference to giving the refused instruction in question. And, since instruction No. 4 was given, it was of course unnecessary for any other instruction to have been given on the same subject.

[17] 7. Did the court err in refusing to give instruction 9 asked for by the accused?

This question must be answered in the affirmative.

This instruction correctly states the law as applicable to such a case as that in judgment. See the citations from Bishop above; also *Stoneman's Case*, 25 Gratt. (66 Va.) ,887; *Brown's Case*, 86 Va. 466, 10 S. E. 745; *Field's Case*, 89 Va. 690, 16 S. E. 865; *Byrd's Case*, 89 Va. 536, 16 S. E. 727.

[18] 8. Did the court err in giving to the jury the initial instruction, which is unnumbered, to the effect "that the issue which they are trying is whether the killing of John Bays by Heywood Fortune was justifiable or not?"

This question must be answered in the affirmative.

This instruction uses the word "justifiable" without qualification. That carries the meaning of entirely or wholly justifiable. The instruction, therefore, withdrew from the jury all consideration of the subject of whether the killing, although not wholly justifiable, amounted only to voluntary manslaughter. It is true that instruction 1, given, defines voluntary manslaughter, but the initial instruction in effect tells the jury that this is not a subject which they can consider;

so that, at the least, there was a conflict in the instructions which was likely to have misled the jury.

[19] 9. Did the court err in giving instructions 7 and 8?

This question must be answered in the affirmative.

Instruction 8 made the justification of the killing depend entirely upon the actual necessity therefor to prevent death or great bodily harm to the accused. This set up a wrong standard for the jury on this subject. Moreover, it wholly ignored the settled doctrine, above referred to, that a necessity reasonably regarded as real by the actor, who vouches it as inducing his action, is regarded as in fact real, so far as the charge of criminal conduct on the part of the actor is concerned. As noted above, instruction 7, as given, did not cure this defect. And there was no instruction given the jury which embodied this doctrine, so important to be considered by the jury, from the standpoint of the accused, in determining his guilt or innocence. This left the jury wholly uninstructed upon a theory of the defense applicable to the evidence for the accused, embodying which proper instructions, to-wit, instructions 5, 7 and 9 were asked for by the accused and refused.

In view of the character of the errors aforesaid, as affecting the right of the accused to present his side of the case fairly and fully before the jury, it plainly appears that the errors were prejudicial to the accused's right of defense, hence, the case will be reversed and a new trial granted.

*Reversed and new trial granted.*