UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present:   Judges Alston, O'Brien and AtLee
Argued at Fredericksburg, Virginia


SERGIO RAMON ZUNIGA ROBLES, A/K/A
  SERGIO ROBLES

                                                        MEMORANDUM OPINION[*]
v.        Record No. 1064-17-4                          JUDGE ROSSIE D. ALSTON, JR.
                                                        OCTOBER 16, 2018
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Jeanette A. Irby, Judge

        Adam C. Pouilliard, Senior Assistant Public Defender, for
        appellant.

        Liam A. Curry, Assistant Attorney General (Mark R. Herring,
        Attorney General, on brief), for appellee.


        Sergio Robles (appellant) appeals his convictions of second-degree murder and

unlawfully stabbing, wounding, or cutting another in the commission of a felony.  He contends

that the trial court erred when it denied his proposed jury instruction.  Assuming that the trial

court erred, we find that the error was harmless.

I. BACKGROUND

        Mario Robles (Mario) and his girlfriend, Daniela Romi Ortiz (Romi), were enjoying a

movie at home[1] alone on January 31, 2016.  Meanwhile, appellant and his girlfriend, Nora

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Mario, appellant—Mario's stepbrother, and Cesar, a friend, rented rooms in the same home.  Mario lived on the basement level while appellant and Cesar lived on the third-floor level.  Mario shared his room with Romi while appellant shared his room with Nora.  No one lived on the ground floor, which encompassed the living room as well as the kitchen and dining area.

Schmitt (Nora), met up at a local establishment and consumed several alcoholic drinks. During the drive home, appellant mentioned to Nora that he was concerned that his Rottweiler, Max, had not been walked. Nora text messaged Mario a reminder to walk Max. Mario prepared to walk Max as Romi drifted off to sleep.

Arriving home, Nora and appellant walked through the front door. Both noticed that Max's leash was gone from its usual place on the bannister. Nora proceeded upstairs while appellant remained on the ground floor. While upstairs, Nora heard the front door open. Mario and appellant began arguing with one another alternating between Spanish and English. The yelling roused Romi.[2] During the heated exchange, Romi overheard appellant ask Mario if he was going to repay him $40. Nora heard appellant yell to Mario "[y]ou always put me down," and Mario continued to "bitch about covering [appellant's] tab." Then appellant screamed "[y]ou think I'm a piece of shit." At some point, Romi heard an exchanging of "blows." Nora decided to intervene. She came down the stairs and witnessed appellant, armed with a knife in each hand, stabbing Mario. Nora screamed, and Romi ran up the stairs. Appellant stood, knives in hand, over Nora, who had knelt beside Mario. Romi attended to Mario. Mario's breathing was labored, and blood covered his chest. Romi called 911. Because she had difficulty understanding what was being said by the 911 operator, she handed the phone to Nora. Realizing that the ambulance would take some time to arrive, Romi sprinted across the street to the police station.

In the short time Romi was gone, Nora asked appellant "[w]hy?" Appellant responded, "Because [Mario] said 'fuck you.'" Nora then asked, "What should I do now?" Appellant replied "It's up to you."

---

[2] Romi is a native Spanish speaker and could only understand portions of the argument in her native language.

Once Romi got the attention of several officers at the police station, she led them to the home. The officers encountered a macabre scene: blood splattered the walls and drenched the entertainment set near Mario's body, two bloody knives rested on top of dirty dishes in the kitchen sink, paper towels saturated in blood laid on the top of the kitchen trash can, and blood was smeared across the kitchen cabinets and countertops.

Detective Zodrow tended to Mario. Noticing Mario's shirt was soaked with blood, Detective Zodrow attempted to determine the origin of the bleeding. He observed two puncture wounds in Mario's chest. Mario had no pupil function, no respiratory function, and no pulse. In the meantime, Officer Taylor questioned appellant and noticed blood dripping from his hand. Appellant first said it was Mario's blood. When she inquired about the injury again, appellant stated that his pinky finger must have gotten cut when he went to Mario's aid. Appellant later commented that his injury occurred after holding Max's collar.

Shortly thereafter, Detective Zappia interviewed appellant at the police station. When asked about what occurred, appellant initially stated that after walking Max, Mario opened the front door already injured and said "Brother, I got fucked up." During the course of the interview, Detective Zappia mentioned that Mario died and showed appellant pictures of the knives found in the kitchen sink. Appellant then maintained that Mario arrived with an African-American drug dealer who later stabbed him.

A five-day jury trial was heard before the Circuit Court of Loudoun County (trial court). The Commonwealth's witnesses testified as outlined above.[3] The Commonwealth also offered medical evidence. Dr. Nicholas Hogan, as the emergency room doctor, found that Mario died from being stabbed. In his examination, Dr. Hogan observed four wounds on Mario's chest. On appellant, he found minor lacerations on appellant's right hand requiring some stitches and

---

[3] Nora was declared an adverse witness.

butterfly bandages.  Dr. Jocelyn Posthumus conducted Mario's autopsy and determined that Mario sustained "a single blunt force wound" as well as a fatal stab wound and four incised wounds on his torso.[4]  DNA evidence was also offered during the course of the trial.  Neither appellant nor Mario could be excluded as contributors regarding the stain found on the top of the "fat knife."[5]  Mario could not be excluded as a contributor from other stains on the "fat knife," stains found on the "skinny knife," or the spot of blood on the front porch.  Appellant could not be excluded as a contributor for stains found on the paper towels as well as the spot of blood on the back porch.

The Commonwealth rested its case.  At the conclusion of the Commonwealth's evidence, appellant made a motion to strike which the trial court denied.  The trial court heard argument on the instruction at issue in this case (proposed instruction).  The proposed instruction, which was not a model jury instruction, consisted of a sentence from Fortune v. Commonwealth, 133 Va. 669, 112 S.E. 861 (1922), and read "a man is not obligated to retreat if assaulted in his home." Recognizing that both appellant and the victim resided in the same residence, the trial court denied the proposed instruction and deferred ruling on other self-defense instructions.

Appellant began his case-in-chief.  Dr. Posthumus testified that Mario did not have any defensive wounds.[6]  In his testimony, appellant contended he was washing dishes when Mario walked through the front door with Max.  Mario approached appellant and said:

>Mario:  [V]ales verga.
>
>[Appellant]:  [W]hat the fuck is wrong with you?
>
>Mario:  Nothing.

---

[4] "A stab wound is deeper than it is lengthwise, and it[ i]s the opposite for an incised wound.  An incised wound is longer than it is deep."

[5] These were terms used at trial.

[6] "A defensive wound is a sharp, forced injury sustained on the extremities."

[Appellant]: What are you doing outside? What are you doing out so late?

Mario: Why do you care? Why the fuck do you care?

[Appellant]: Really? You know you're on probation. You're not supposed to be out . . . . [I]f you're having so much problems with [Romi], why don't you just ask her to leave?

Mario: [You] d[o]n't have the right to tell [me] what to do about [my] personal life.

According to appellant, the argument became violent. Mario hit appellant's right side and pushed appellant's shoulder. Appellant stumbled back into the block of knives on the counter, knocking the knives out of the block. Mario screamed "Fuck you. You're a piece of shit. I'm going to fuck you up. Do something." Appellant refused, explaining that after a childhood fight he promised he would never lay a hand on Mario again. Appellant demanded that Mario "[g]et the fuck out of the house," but Mario refused. Mario tried to stab appellant. Appellant blocked the swing, sustaining a cut to his finger. Appellant pushed Mario. After telling Mario to leave again, appellant kicked Mario's hand or the knife he held, causing the knife to fall to the ground. Appellant threw open the back door, ordering Mario to leave. Instead, Mario pushed appellant and yelled "Come on. Fight me. Stop being a little bitch. Just fight me. Forget your fucking promise . . . . I'm not that little boy anymore." Appellant declined. Mario retrieved a knife and swung at appellant. Appellant claimed that he deflected the slashes, sustaining another hand injury. Appellant then returned to the kitchen and grabbed paper towels and a rag. Mario then threw appellant onto the floor, sat on top of him, and hit him on his back and shoulder. Appellant managed to get up. He opened the front door, demanding that Mario leave. Mario maintained his position. Appellant swore he would not spend any more money on Mario if he went back to jail. Mario responded: "I don't give a fuck about money,"

and appellant replied, "[w]hat do you mean you don't give a fuck? . . . . You're crying over $40 you paid for a tab that I had."

Mario dragged appellant onto the couch, and as appellant got up, Mario turned appellant around, punched him, and continued pummeling appellant's shoulder and back. Mario picked up another knife and swung it at appellant's face, cutting appellant's hand again. Appellant opened the back door and demanded that Mario leave. Mario would not. At this point, Nora came downstairs and pleaded with them to stop arguing. Appellant retrieved the knives scattered across the floor because he "didn't want [Mario] to get ahold of [them]." Appellant "was afraid" because he "had never seen [Mario] that mad." He hoped to prevent Mario from "trying to hurt [him]." Appellant held the knives in a bundle. Appellant stood up, and because he did not look at Mario, he did not "realize that [Mario] was coming at [him]." Mario collapsed and began shaking. Appellant, not realizing the extent of Mario's injuries, thought Mario was suffering from an epileptic seizure. While Romi left to get the police, appellant put the knives he injured Mario with in the kitchen sink and threw those Mario injured appellant with behind the fence of their backyard. Appellant replaced the knives that fell out of the knife block with those from a nearby drawer and righted the kitchen chairs that had tipped over.

Appellant admitted that he gave various explanations to authorities regarding what occurred because he was shielding Mario from criminal liability. He also admitted to providing different explanations for his hand injuries. Another witness, an investigator appellant hired, testified that a bent knife blade was found behind the fence of the home in August.

Appellant rested.

The Commonwealth presented rebuttal evidence. One witness testified that there were no sufficient DNA samples or prints suitable for testing on the bent blade. Detective Mocello

- 6 -

testified that in his brief search behind the fence the day after the murder, he found nothing of interest.

Appellant renewed his motion to strike the evidence, which the trial court again denied. Outside the presence of the jury, the trial court heard argument on jury instructions regarding the theories of accident and self-defense. The trial court found that the evidence supported both theories. And more specifically with regard to self-defense, the trial court found that the evidence supported both with fault and without fault instructions. Ultimately, the trial court granted the following self-defense instructions:

*Jury Instruction L*

If you believe that [appellant] was to some degree at fault in provoking or bringing on the fight, but you further believe that:

> (1) he retreated as far as he safely could under the circumstances in a good faith attempt to abandon the fight; and
> (2) made known his desire for peace by word or act; and
> (3) he reasonably feared, under the circumstances as they appeared to him, that he was in imminent danger of being killed or that he was in imminent danger of great bodily harm; and
> (4) he used no more force, under the circumstances as they appeared to him, than was reasonably necessary to protect himself from the perceived harm, then the killing was in self-defense, and you shall find [appellant] not guilty.

*Jury Instruction M*

If [appellant] is at fault in provoking or bringing on the fight to the minutest degree, then he cannot be deemed as without fault.

*Jury Instruction N*

If you believe that [appellant] was without fault in provoking or bringing on the fight, and you further believe that:

> (1) he reasonably feared, under the circumstances as they appeared to him, that he was in imminent danger of being

killed or that he was in imminent danger of great bodily harm; and
(2) he used no more force, under the circumstances as they appeared to him, than was reasonably necessary to protect himself from the perceived harm,

then the killing was in self-defense, and you shall find the defendant not guilty.

After being instructed, the jury deliberated, and found appellant guilty of second-degree murder and of unlawfully stabbing, cutting, or wounding another in the commission of a felony. The trial court adopted the jury's verdict and sentenced him to twenty-five years' imprisonment on the murder conviction and one year's imprisonment on the adjoining felony conviction.

This appeal followed.

## II. ANALYSIS

"As a general rule, the matter of granting and denying [jury] instructions . . . rest[s] in the sound discretion of the trial court." Bell v. Commonwealth, 66 Va. App. 479, 486, 788 S.E.2d 272, 275 (2016) (quoting Cooper v. Commonwealth, 277 Va. 377, 381, 673 S.E.2d 185, 187 (2009)).

> In reviewing jury instructions, our "'sole responsibility . . . is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" King v. Commonwealth, 64 Va. App. 580, 586-87, 770 S.E.2d 214, 217-18 (2015) (en banc) (quoting Molina v. Commonwealth, 272 Va. 666, 671, 636 S.E.2d 470, 473 (2006)). "'[Appellant] is entitled to have the jury instructed only on those theories of the case that are supported by [more than a scintilla of] evidence.'" Id. at 587, 770 S.E.2d at 218 (alteration in original) (quoting Eaton v. Commonwealth, 240 Va. 236, 255, 397 S.E.2d 385, 397 (1990)).

Payne v. Commonwealth, 65 Va. App. 194, 203, 776 S.E.2d 442, 446 (2015). "In determining whether evidence amounts to more than a scintilla, 'we must look at the evidence in the light most favorable to [the proponent of the instruction].'" Bell, 66 Va. App. at 486, 788 S.E.2d at 275 (quoting Herbin v. Commonwealth, 28 Va. App. 173, 181, 503 S.E.2d 226, 230 (1998)).

- 8 -

"'The weight of the credible evidence that will amount to more than a mere scintilla . . . is a matter to be resolved on a case-by-case basis' by assessing the evidence in support of a proposition against the 'other credible evidence that negates' it." Woolridge v. Commonwealth, 29 Va. App. 339, 348, 512 S.E.2d 153, 157-58 (1999) (quoting Brandau v. Commonwealth, 16 Va. App. 408, 411-12, 430 S.E.2d 563, 565 (1993)). We also note that "[n]o instruction 'should be given that incorrectly states the applicable law or which would be confusing or misleading to the jury.'" Kennemore v. Commonwealth, 50 Va. App. 703, 712, 653 S.E.2d 606, 610 (2007) (quoting Mouberry v. Commonwealth, 39 Va. App. 576, 581-82, 575 S.E.2d 567, 569 (2003)). In addition, "[a]n instruction accurately stating the law is nonetheless improperly given if it is 'inapplicable to the facts and circumstances of the case.'" Juniper v. Commonwealth, 271 Va. 362, 418, 626 S.E.2d 383, 419 (2006) (quoting Hatcher v. Commonwealth, 218 Va. 811, 813-14, 241 S.E.2d 756, 758 (1978)). And when this Court conducts a "review of the propriety of a particular instruction, [the Court] look[s] to the instructions as a whole." Graves v. Commonwealth, 65 Va. App. 702, 707, 780 S.E.2d 904, 906 (2016) (citing Hodge v. Commonwealth, 217 Va. 338, 346-47, 228 S.E.2d 692, 697-98 (1976)).

Appellant's proposed instruction is the keystone of his self-defense theory. At the outset, we note that

> [t]o establish a claim of self-defense, [appellant] must show that he reasonably feared death or serious bodily harm at the hands of his victim. McGhee v. Commonwealth, 219 Va. 560, 562, 248 S.E.2d 808, 810 (1978). Whether the danger is reasonably apparent is judged from the viewpoint of [appellant] at the time of the incident. Id. [Appellant] must also show that he was in imminent danger of harm, that is, a showing of an overt act or other circumstance that affords an immediate threat to safety. Commonwealth v. Cary, 271 Va. 87, 99, 623 S.E.2d 906, 912 (2006). Finally, when a party assaults a homeowner in his own home, as in this case, the homeowner has the right to use whatever force necessary to repel the aggressor. Fortune v. Commonwealth, 133 Va. 669, 687, 112 S.E. 861, 867 (1922) (recognizing the law derived from the "Defense of the Castle" doctrine provides that "a

> man is not obliged to retreat if assaulted in his dwelling, but may use such means as are absolutely necessary to repel the assailant . . . even to the taking of life").

Hines v. Commonwealth, 292 Va. 674, 679, 791 S.E.2d 563, 565 (2016).

> Virginia law recognizes two forms of self-defense to criminal acts of violence: self-defense without fault ("justifiable self-defense") and self-defense with fault ("excusable self-defense"). "Justifiable homicide in self-defense occurs where a person, without any fault on his part in provoking or bringing on the difficulty, kills another under reasonable apprehension of death or great bodily harm to himself." Bailey v. Commonwealth, 200 Va. 92, 96, 104 S.E.2d 28, 31 (1958). On the other hand, "[e]xcusable homicide in self-defense occurs where the accused, although in some fault in the first instance in provoking or bringing on the difficulty, when attacked retreats as far as possible, announces his desire for peace and kills his adversary from a reasonably apparent necessity to preserve his own life or save himself from great bodily harm." Id.

Bell, 66 Va. App. at 487, 788 S.E.2d at 275-76.

Appellant argues on appeal that the trial court erred in denying his proposed instruction. Appellant contends that there is a scintilla of evidence to support the "Castle doctrine" theory of self-defense, thereby entitling him to the proposed instruction. He further asserts that the proposed instruction is a correct statement of law. Conversely, the Commonwealth argues that there is not a scintilla of evidence to support this theory of self-defense; thus, appellant is not entitled to this instruction.

Assuming without deciding that the trial court erred in not instructing the jury on the "Castle doctrine," the error was harmless; the evidence supporting appellant's guilt is overwhelming and the error so insignificant by comparison that we can conclude the error failed to have any "substantial influence" on the verdict.[7] "[N]on-constitutional error is harmless

---

[7] Because harmless error resulted, we need not reach the merits of appellant's argument. However, we note that neither the General Assembly nor Virginia courts have applied the castle doctrine in this context. The castle doctrine originated as follows:

'when it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached.'" Lavinder v. Commonwealth, 12 Va. App. 1003, 1005-06, 407 S.E.2d 910, 911 (1991) (*en banc*) (quoting Code § 8.01-678).  Stated differently, "[n]on-constitutional error is harmless if other evidence of guilt is so 'overwhelming' and the error so insignificant by comparison that we can conclude the error 'failed to have any "substantial influence" on the verdict.'" Bell v. Commonwealth, 47 Va. App. 126, 140 n.4, 622 S.E.2d 751, 757 n.4 (2005) (quoting United States v. Lane, 474 U.S. 438, 450 (1986)).  "Thus, where the reviewing court is able to determine that the trial court's error in failing to instruct the jury could not have affected the verdict, that error is harmless." Turner v. Commonwealth, 23 Va. App. 270, 276, 476 S.E.2d 504, 507 (1996).  Before employing our harmless error analysis, we recognize that it is "'the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless' lest they 'retreat from their responsibility, becoming instead "impregnable citadels of technicality."'" Commonwealth

---

> [i]n the early times our forefathers were compelled to protect themselves in their habitations by converting them into holds of defense:  and so the dwelling house was called the castle . . . resulting in the familiar doctrine that while a man keeps the doors of his house closed, no other may break and enter it, except in particular circumstances to make an arrest or the like . . . .  From this doctrine is derived another:  namely, that the persons within the house may exercise all needful force to keep aggressors out, even to the taking of life.  As observed by Campbell, J., in Michigan, "a man is not obliged to retreat if assaulted in his dwelling, but may use such means as are absolutely necessary to repel the assailant from his house or prevent his forcible entry, even to the taking of life."

Fortune, 133 Va. at 687-88, 112 S.E. at 867 (quoting 1 Bish. New Cr. Law (8th ed.), sections 857, 858).  See Juniper, 271 Va. at 418, 626 S.E.2d at 419 ("An instruction accurately stating the law is nonetheless improperly given if it is 'inapplicable to the facts and circumstances of the case.'" (quoting Hatcher, 218 Va. at 813-14, 241 S.E.2d at 758)); Kennemore, 50 Va. App. at 712, 653 S.E.2d at 610 ("No instruction 'should be given that incorrectly states the applicable law or which would be confusing or misleading to the jury.'" (quoting Mouberry, 39 Va. App. at 581-82, 575 S.E.2d at 569)).

v. White, 293 Va. 411, 420, 799 S.E.2d 494, 498 (2017) (quoting United States v. Hasting, 461 U.S. 499, 509 (1983)).

There was ample and overwhelming evidence of appellant's guilt. An argument occurred between appellant and Mario that quickly became a physical confrontation. Nora ran down the stairs and witnessed appellant, holding a knife in each hand, stab Mario. Romi saw appellant standing over Mario and Nora, holding a bloody knife in each hand. While Romi fled to the police station, Nora, looking at Mario's blood-soaked body, asked appellant "[w]hy?" to which appellant responded "[b]ecause [Mario] said '[f]uck you.'" Mario died from a fatal stab wound while appellant sustained minor lacerations to his hand. Appellant provided three different versions of events regarding the night in question: 1) Mario arrived home, already injured; 2) Mario arrived home with a drug dealer who later stabbed him; and at trial, 3) Mario accidentally walked into a bundle of knives appellant held. Appellant testified that Mario antagonized appellant, punching and pushing him. Appellant asserted that he did not reciprocally respond to Mario's attacks with physical violence other than attempting to kick the knife out of Mario's hand.

Appellant could not explain why Nora did not testify that appellant collected the knives scattered across the floor. Appellant's testimony that Mario ultimately caused his own death by walking into the bundle of knives appellant held is entirely uncorroborated and contrary to eyewitness testimony. Appellant admitted to manipulating the furniture on the ground floor while Romi summoned the authorities. Appellant also testified that he threw several knives stained with his blood behind the fence to protect Mario. However, an initial search of the area behind the fence yielded nothing of interest and only several months later was a bent blade found. Further, there was no traceable DNA or testable prints on the bent blade.

We can conclude from the record "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." Carter v. Commonwealth, 293 Va. 537, 546, 800 S.E.2d 498, 502 (2017) (quoting Adams v. Commonwealth, 275 Va. 260, 277-78, 657 S.E.2d 87, 97 (2008)). Accordingly, if the trial court erred, that error was harmless.

## III. CONCLUSION

Considering the overwhelming evidence of appellant's guilt before this Court, we hold that if the trial court erred in denying appellant's proposed instruction, the error was harmless. Accordingly, we affirm.

Affirmed.