COURT OF APPEALS OF VIRGINIA


Present:  Judges Elder, Frank and Humphreys
Argued at Salem, Virginia


WILLIAM JOSEPH CRAIG
                                          OPINION BY
v.    Record No. 3058-99-3         JUDGE ROBERT P. FRANK
                                        DECEMBER 19, 2000
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF WAYNESBORO
                    Thomas H. Wood, Judge

          Francis Chester for appellant.

          John H. McLees, Jr., Senior Assistant
          Attorney General (Mark L. Earley, Attorney
          General, on brief), for appellee.


     William Joseph Craig (appellant) appeals his conviction of

involuntary manslaughter on an indictment charging second degree

murder.  On appeal, he contends the trial court erred in granting

an instruction offered by the Commonwealth on the lesser-included

offense of involuntary manslaughter.  Finding no error, we affirm

the judgment of the trial court.

                        I.   BACKGROUND

     Appellant lived with his wife, Susan, and their three

daughters, Joanne, McKayla, and Grayson.  In October 1997,

McKayla and Grayson, who were twins, were five and one-half

months old.  On October 3, 1997, Grayson had been in the local

hospital for three days with double pneumonia.  While she was

hospitalized, Susan and Susan's mother took turns attending her,

while appellant stayed home and cared for McKayla and Joanne.

On October 3, 1997, Susan learned that Grayson was to be discharged that day. She called appellant at work and asked him to come home to watch McKayla while she brought Grayson home from the hospital. Appellant arrived home between 1:30 p.m. and 2:00 p.m.

McKayla did not feel well and was "fussy" that day. Because taking her for rides in the car often soothed her, and because he needed cigarettes, appellant took her for a ride in the car. He would later testify that during the ride, he had to stop suddenly, which first threw McKayla forward in her front-seat car seat and then jolted her back. He said this occurred around 2:45 p.m. According to appellant, this incident again made McKayla fussy, but she soon calmed down. When he arrived home with McKayla around 3:00 p.m., he described her as awake, clinging, and "lovey dovey" with him. Susan, who had not yet left for the hospital, described McKayla as "sleepy."

Susan left for the hospital shortly after appellant and McKayla returned, leaving appellant as the sole caretaker of McKayla. She said McKayla was "fine" when she left. According to appellant, McKayla got fussy again. He tried to feed her and she ate some baby food carrots, but she then spit the rest out. He rocked her and put her to bed around 3:30 p.m. He checked on her several times thereafter. He said she moved from her original position.

McKayla stayed in her crib, on her stomach, and was in that position when Susan came home at approximately 5:30 p.m. Appellant left for work when Susan's mother arrived with the other twin, Grayson. He waited so he could see Grayson before he

left for work.  Appellant left around 6:35 p.m. and arrived at work ten minutes later.  He remained at work until 9:30 p.m. and then returned home.

Susan's mother arrived at the home around 6:00 p.m. and remained for approximately two hours.  She checked on McKayla from time to time during this period but did not remember seeing her move and did not hear her cry.

During the time Susan was home between 5:30 p.m. and 9:15 p.m., she looked in on McKayla periodically.  Between 8:00 p.m. and 9:15 p.m., she checked on her at least three times and stated that "as far as [she] knew, [McKayla] was fine."  Susan did not testify as to whether or not McKayla moved at any time during this period.  According to appellant, she moved once around 5:20 p.m.  Neither Susan nor her mother noticed anything amiss until about 9:15 p.m., when Susan realized that McKayla had not moved at all and was unresponsive.  Susan picked McKayla up, but the baby was "lifeless."  She took McKayla out of the crib but nothing could rouse the baby.  When appellant came home from working late, he found Susan distraught, with the baby unconscious on the bed.

An ambulance took McKayla to the Augusta Medical Center. There, the emergency room physician found her "in grave distress," and "near death."  She was unconscious, limp, barely breathing, and undergoing seizures.  A CAT-scan of her head was, at first, misread by the radiologist as being normal, but the physician soon caught the error and saw that it showed a head injury, which involved internal swelling and pressure on the brain.  There were no external bruises or similar signs of

injury.  The doctor asked appellant and Susan if the baby had been injured, and Susan replied that she had not.

The doctor concluded that the baby had a head injury. McKayla was put on a respirator to assist her breathing and was taken by helicopter to the University of Virginia Medical Center for more sophisticated treatment.

Upon McKayla's arrival at the University of Virginia Medical Center, the pediatric intensive care specialist found her totally without muscle tone, unresponsive, and "very deeply comatose." Repetition of the tests for infection and other causes were negative, and the doctor concluded that her severe brain swelling had been caused by child abuse.  Susan told him the child had not been abused but mentioned an incident the day before when another child had accidentally hit her with a toy truck.  The doctor told appellant and Susan there was nothing they could do to keep McKayla alive.

In addition to the emergency room doctor from Augusta Medical Center and the pediatric intensive care specialist from the University of Virginia Medical Center, two other doctors, a forensic pathologist, who performed the autopsy, and one of the leading pediatric neuropathologists in the country, who had reviewed the autopsy findings and materials, testified about the cause of McKayla's death.  Both opined that she died of "shaken baby syndrome."  The other possible causes for her symptoms had been repeatedly ruled out by testing.

Shaken baby syndrome involves internal ruptures of blood vessels around the brain, causing fatal internal pressure on the brain and injury to the spinal column, which causes impaired

blood supply to the brain.  The doctors explained the cause of this constellation of injuries as "a child is held by an adult and shaken very violently," "repeated strong shakings of the individual," and "the child has been shaken repeatedly, so that the baby's head goes back and forth, back and forth."  They testified that, because of the strong repetitive force required for this injury, the car seat incident described by appellant could not possibly have caused it.  Moreover, they agreed that the sort of injuries suffered by McKayla would have rendered her unconscious "within seconds to minutes" if the car seat incident had caused her injuries.  Therefore, she would not have been able to remain awake and clinging, as both appellant and Susan described her upon the return from the car ride, and would not have been able to eat, then refuse food, remain awake, and then fall asleep, as appellant described her doing before he put her in the crib.

Susan testified she had not shaken the baby and did not see anyone else do so.  Appellant also denied doing anything to harm McKayla and said he did not know how McKayla had been injured.

Appellant was indicted for second degree murder and was tried before a jury on July 13-14, 1999.  The Commonwealth offered an instruction for murder and the lesser-included offense of involuntary manslaughter.  Over appellant's objection, the trial court instructed the jury on second degree murder and involuntary manslaughter.  The jury returned with a verdict of guilty of involuntary manslaughter.

## II.  ANALYSIS

Appellant contends the trial court erred in granting the Commonwealth's instruction on involuntary manslaughter. Appellant argues that while the accused may ask for an instruction on a lesser-included offense, the Commonwealth may not. Appellant cites a law review article for the proposition that the accused has the right to bar a lesser-included offense instruction and "go for broke," has a right to insist on a verdict of guilt on the charged offense or acquittal of that offense. Alternatively, appellant contends the evidence did not support an instruction on involuntary manslaughter.

We reject appellant's contention that the accused has a right to control the Commonwealth's submission of an instruction on the lesser-included offense. Appellant cites no authority, nor can we find any, to support his position. Appellant cites a number of federal and state decisions, including decisions from Virginia, holding that an accused is entitled to an instruction on the lesser-included offense if evidence supports such an instruction. However, that is not the issue raised by appellant.

Appellant cites State v. Wallace, 337 S.E.2d 321 (W. Va. 1985), which refutes his position. The Supreme Court of Appeals of West Virginia rejected the argument that the state, by choosing to indict the accused for the greater offense, is foreclosed from seeking a lesser verdict from the jury, stating,

> [t]his argument ignores the generally
> recognized origin of the concept of lesser
> included offenses which is that it was
> originally developed to aid the prosecution
> as summarized in Beck v. Alabama, 447 U.S.
> 625, 633, 100 S. Ct. 2382, 2387-88, 65
> L.Ed.2d 392, 400 (1980).

Id. at 324.

Hagans v. State, 559 A.2d 792 (Md. 1989), also cited by appellant, further belies his position. In Hagans, the Court of Appeals of Maryland, referring to lesser-included offenses, stated:

> "The doctrine is a valuable tool for defendant, prosecutor, and society. From a defendant's point of view, it provides the jury with an alternative to a guilty verdict on the greater offense. From the prosecutor's viewpoint, a defendant may not go free if the evidence fails to prove an element essential to a finding of guilt on the greater offense. Society may receive a benefit because, in the latter situation, courts may release fewer defendants acquitted of the greater offense. In addition, the punishment society inflicts on a criminal may conform more accurately to the crime actually committed if a verdict on a lesser included offense is permissible."

Id. at 801 (citation omitted).

Further, Code § 19.2-266.1 requires the rejection of appellant's first argument. It states:

> In any trial upon an indictment charging homicide, the jury or the court may find the accused not guilty of the specific offense charged in the indictment, but guilty of any degree of homicide supported by the evidence for which a lesser punishment is provided by law.[1]

Code § 19.2-266.1 does not limit the offering of lesser-included instructions to the accused. Further, the

---

[1] Involuntary manslaughter is a lesser-included offense of murder. Puckett v. Commonwealth, 182 Va. 237, 240, 28 S.E.2d 619, 620 (1944) ("In an indictment for murder, the elements of crime embraced therein are murder, voluntary manslaughter, involuntary manslaughter and simple assault.").

language of Code § 19.2-266.1 is clear and needs no interpretation.

> "The province of [statutory] construction lies wholly within the domain of ambiguity, and that which is plain needs no interpretation." Winston v. City of Richmond, 196 Va. 403, 408, 83 S.E.2d 728, 731 (1954). See Harrison & Bates, Inc. v. Featherstone Assocs. Ltd. Partnership, 253 Va. 364, 368, 484 S.E.2d 883, 885 (1997). "Words are ambiguous if they admit to 'being understood in more than one way[,]' . . . refer to 'two or more things simultaneously[,]' . . . are 'difficult to comprehend,' 'of doubtful import,' or lack 'clearness and definiteness.'" Diggs v. Commonwealth, 6 Va. App. 300, 301-02, 369 S.E.2d 199, 200 (1988) (en banc) (citation omitted).

Coleman v. Commonwealth, 27 Va. App. 768, 773, 501 S.E.2d 461, 463 (1998).

"'The plain, obvious, and rational meaning of a statute is always preferred to any curious, narrow or strained construction.'" Gilliam v. Commonwealth, 21 Va. App. 519, 522-23, 465 S.E.2d 592, 594 (1996) (quoting Branch v. Commonwealth, 14 Va. App. 836, 839, 419 S.E.2d 422, 424 (1992)).

Here, Code § 19.2-266.1 is unambiguous and its plain meaning requires granting an instruction on the lesser-included offense at the request of either party, assuming the evidence supports the granting of the instruction.

In a due process context, the Virginia Supreme Court has ruled that an indictment, to be sufficient, must give the accused notice of the nature and character of the charged offense. Commonwealth v. Dalton, 259 Va. 249, 253, 524 S.E.2d 860, 862 (2000). The Court concluded:

It is firmly established, therefore, that an accused cannot be convicted of a crime that has not been charged, unless the crime is a lesser-included offense of the crime charged. Thus, neither the Commonwealth nor an accused is entitled to a jury instruction on an offense not charged, unless the offense is a lesser-included offense of the charged offense.

Id.

We, therefore, reject appellant's argument and find that the Commonwealth may request an instruction on a lesser-included offense and that the trial court may grant such instruction, over the objection of the defense, as long as the evidence supports such an instruction.

Appellant next contends the evidence was insufficient to support the involuntary manslaughter instruction.

"If there is any evidence that would support a conviction for the lesser included offense, the trial court must, upon request of counsel, instruct the jury as to the lesser included offense. An instruction, however, must be based on more than a scintilla of evidence." Miller v. Commonwealth, 5 Va. App. 22, 24, 359 S.E.2d 841, 842 (1987) (citations omitted). "An instruction is properly refused when it is unsupported by the evidence." Bennett v. Commonwealth, 8 Va. App. 228, 234, 380 S.E.2d 17, 21 (1989) (citations omitted).

The determination of whether "the weight of the credible evidence . . . will amount to more than a mere scintilla of evidence is a matter to be resolved on a case-by-case basis." Brandau v. Commonwealth, 16 Va. App. 408, 412, 430 S.E.2d 563, 565 (1993). "On appeal, when the issue is a refused jury instruction, we view the evidence in the light most favorable to

the proponent of the instruction."  Lynn v. Commonwealth, 27 Va. App. 336, 344, 499 S.E.2d 1, 4-5 (1998) (citation omitted), aff'd, 257 Va. 239, 514 S.E.2d 147 (1999).

"Malice, a requisite element for murder of any kind, is unnecessary in manslaughter cases and is the touchstone by which murder and manslaughter cases are distinguished."  Essex v. Commonwealth, 228 Va. 273, 280, 322 S.E.2d 216, 219-20 (1984) (citation omitted).  "Malice may be either express or implied by conduct."  Id. (citation omitted).  "[W]hether a defendant acted with malice is generally a question to be decided by the trier of fact."  Pugh v. Commonwealth, 223 Va. 663, 667, 292 S.E.2d 339, 341 (1982) (citing Bryan v. Commonwealth, 131 Va. 709, 714, 109 S.E. 477, 478 (1921)).  "Express malice is evidenced when 'one person kills another with a sedate, deliberate mind, and formed design.'  Implied malice exists when any purposeful, cruel act is committed by one individual against another without any, or without great provocation . . . ."  Id. at 668, 292 S.E.2d at 341 (citations omitted).

> The authorities are replete with definitions of malice, but a common theme running through them is a requirement that a wrongful act be done "wilfully or purposefully."  This requirement of volitional action is inconsistent with inadvertence.  Thus, if a killing results from negligence, however gross or culpable, and the killing is contrary to the defendant's intention, malice cannot be implied.  In order to elevate the crime to second-degree murder, the defendant must be shown to have wilfully or purposefully, rather than negligently, embarked upon a course of wrongful conduct likely to cause death or great bodily harm.

Essex, 228 Va. at 280-81, 322 S.E.2d at 220 (citation omitted).

To support an involuntary manslaughter conviction, the Commonwealth must prove "'a homicide was not improbable under all of the facts existing at the time, and that the knowledge of such facts should have had an influence on the conduct of the offender.'" Hargrove v. Commonwealth, 10 Va. App. 618, 620, 394 S.E.2d 729, 731 (1990) (quoting Tubman v. Commonwealth, 3 Va. App. 267, 274, 348 S.E.2d 871, 875 (1986)).

> Criminal negligence as the basis for involuntary manslaughter is judged under an objective standard and, therefore, may be found to exist where the offender either knew or should have known the probable results of his acts. See Keech [v. Commonwealth], 9 Va. App. [272,] 279, 386 S.E.2d [813,] 817 [(1989)] (citing Bell v. Commonwealth, 170 Va. 597, 611-12, 195 S.E. 675, 681 (1938)). Thus, criminal negligence "'is acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another.'" Tubman, 3 Va. App. at 271, 348 S.E.2d at 873 (emphasis added) (quoting Griffin [v. Shively], 227 Va. [317,] 321, 315 S.E.2d [210,] 213 [(1984)]; Friedman v. Jordan, 166 Va. 65, 68, 184 S.E. 186, 187 (1936)).

Conrad v. Commonwealth, 31 Va. App. 113, 121-22, 521 S.E.2d 321, 325-26 (1999) (en banc).

In this case, it was the jury's task, based on the evidence, to determine whether or not appellant acted with malice. From the evidence, the jury could have concluded that appellant did not willfully or purposely kill his child but rather negligently shook the baby, knowing his conduct probably would cause injury. Thus, the evidence supports the instruction on involuntary manslaughter.

For these reasons, we affirm the judgment of the trial court.

<u>Affirmed.</u>