COURT OF APPEALS OF VIRGINIA

Present: Judges Malveaux, Ortiz and Friedman
Argued at Norfolk, Virginia

DANIEL LEE HORNE

v.      Record No. 1267-22-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE FRANK K. FRIEDMAN
DECEMBER 28, 2023

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Robert B. Rigney, Judge

J. Barry McCracken, Assistant Public Defender, for appellant.

Ken J. Baldassari, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Daniel Lee Horne was convicted of aggravated malicious wounding, using a firearm in

the commission of a felony, and maliciously shooting into an occupied dwelling. He challenges

the sufficiency of the evidence to sustain his convictions and asserts that the trial court erred in

refusing to grant his tendered "Castle Doctrine" jury instruction.

BACKGROUND

There are two main questions posed in this appeal—and each of these issues raises a

different standard of review, which in turn changes the way we look at the facts. To begin,

"[w]hen reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed

correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'"

*McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (second alteration in original)

(quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

However, "[w]hen reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Pena Pinedo v. Commonwealth*, 300 Va. 116, 118 (2021) (quoting *Commonwealth v. Vaughn*, 263 Va. 31, 33 (2002)). In general, "the matter of granting and refusing jury instructions rests 'in the sound discretion of the trial court.'" *Id.* at 121 (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). But we review de novo whether a proffered jury instruction "accurately states the . . . law." *Graves v. Commonwealth*, 65 Va. App. 702, 707 (2016) (quoting *Sarafin v. Commonwealth*, 288 Va. 320, 325 (2014)). "This Court's 'sole responsibility in reviewing' the trial court's decision 'is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Id.* (quoting *Cooper*, 277 Va. at 381).

In short, when reviewing sufficiency, we view the facts in the light most favorable to the Commonwealth. By contrast, when reviewing proffered instructions, we view the facts in the light most favorable to the party proposing the instruction—here, Horne. This difference in standards of review leads us to review the facts in two ways—which, in this case, are diametrically opposed. The facts are outlined below.

*Facts in Light Most Favorable to Commonwealth*

Tyquane Perry was the shooting victim in this case. He testified that he arrived at the residence of Jasmine Murphy in the early morning hours of July 6, 2020, to have her fix him some food and to spend time together before he went to work. Although the couple was separated, Murphy is the mother of his three children and the children lived with Murphy. Perry and Murphy had spent the previous several days together, and they had made plans the night before for Perry to come over the following morning.

When Perry arrived at Murphy's residence, he attempted to reach her via telephone but when he received no response, he testified that he proceeded to enter the home in a way that was not out of the ordinary. Perry went to the rear of the residence and removed the air conditioner from the window in order to gain access to the home. Perry testified that "[g]oing through the back window is normal if I didn't have my key on me" and that both he and Murphy had previously entered her residence this way. Perry also testified that he believed it was proper for him to enter the house because his children resided there and he kept his work clothes and multiple forms of identification there.

There was a reason Murphy was ignoring Perry's efforts to reach her—her boyfriend, Horne, had spent the night. Murphy tried to send Perry money to go buy food elsewhere, but he was undeterred and entered anyway. When Perry entered, Murphy came downstairs and asked him to go outside to talk. Perry testified that Murphy was not upset by his entrance but was simply saying to "go to the car to talk." However, Perry testified that he had to use the bathroom, located upstairs. When Perry went upstairs to use the restroom, Horne appeared. Horne had a gun pointed at Perry and stated "[w]hat's up, pussy?" At this time, Horne "busted" Perry's lip and shot Perry in the neck. After shooting Perry, Horne fled the residence.

Perry was aware that Horne and Murphy had been dating, and he was not jealous. To the contrary, Perry was "okay" with Murphy "hav[ing] other relationships" because he was "having other relationships" too. However, Perry testified that he was not aware Horne was supposedly staying at Murphy's residence, as Murphy had spent several days with Perry and had discussions with him regarding rekindling their relationship.

Similarly, Murphy testified that Horne was not officially living there, but was there quite frequently. Murphy also testified that the night before, she attended a cookout at Perry's home and "[i]t was great coparenting."

After being shot by Horne, Perry became paralyzed from the chest down and remained in the hospital for 28 days. Perry testified that although he had a 9-millimeter Taurus with him, he did not take it out at any point. Instead, Perry only had this gun with him because he worked as security. Although there was another one of Perry's guns located in a dresser, Perry does not know how his firearm ended up in there. The Commonwealth's evidence established that the gun Perry was carrying was not the one that shot him.[1]

*Facts in Light Most Favorable to Horne*

According to Horne, when Perry arrived at Murphy's residence the morning of July 6, 2020, Perry began throwing rocks at her window after not being let in the front door. He ultimately gained entry by removing the air conditioning unit from the window. Perry had neither a key nor permission to enter the house. Perry's entrance prompted Murphy to begin yelling at him and telling him to go outside. Although Perry wanted Murphy to make him lunch,

---

[1] Virginia Department of Forensic Science firearm and toolmark examiner Julianna Red Leaf testified that she examined both a Taurus Model G2C, 9-millimeter caliber Luger pistol and a "Starline brand caliber .45 GAP cartridge case." Red Leaf testified that a .45 GAP is much larger in width and would not fit into a 9-millimeter Luger firearm and therefore "[t]he GAP cartridge case could not have been fired in the 9-millimiter pistol." In other words, the gun which was shot was not the gun which Perry was carrying.

she instead sent him $10 via cash app. Perry struck her and then dragged her by her hair to the dining area as Murphy continued to scream. None of this, however, prompted Horne to come downstairs. Perry then appeared to acquiesce and agreed to go outside to talk; however, while Murphy was walking towards the front door, Perry ran to the top of the stairs towards the bedrooms.

Horne was initially awoken by the rocks hitting Murphy's window and then heard Murphy's phone continuously ringing with messages from Perry. Horne then heard the commotion going on downstairs, as Murphy attempted to make Perry leave the residence. Then, Horne observed Perry rushing up the stairs with one gun in his hand and a second gun on his hip. Horne, unarmed at the time, tussled with Perry at the top of the stairs. At this time, the gun in Perry's hand discharged. Horne testified that he had his back to the wall and when he got toward the gun, "the gun goes off and shoots [Perry], and I just ran for my life. The gun was still out there. I didn't know that he was shot." Horne then testified that he and Perry "probably shot it together. I don't know. I didn't exactly possess the gun and point it at him and shoot him." Horne then fled the scene, unaware that Perry had been shot.

Prior to the shooting, Horne had been spending several days with his girlfriend, who was not Murphy. However, he testified that he and Murphy had recently become fiancées and that he now lived in her house. His residency was not confirmed by Murphy; in any event, the record makes clear there was no formal "tenancy" agreement nor was Horne the "homeowner."

*The Tendered Instructions on Self-Defense and the Castle Doctrine*

The trial court granted a jury instruction on self-defense without fault that stated:

> If you believe that the defendant was without fault in provoking or bringing on the fight, and you further believe that: 1) he reasonably feared, under the circumstances as they appeared to him, that he was in imminent danger of bodily harm; and 2) he used no more force, under the circumstances as they appeared to him, than was reasonably necessary to protect himself from the perceived harm,

then he acted in self-defense, and you shall find the defendant not guilty.

Horne contended that he was also entitled to a broader instruction on the Castle Doctrine. He tendered the following: "[w]hen a party is assaulted in his own home, that party as a homeowner or tenant, as the case may be, has a right to use whatever means necessary to repel the aggressor even to the taking of life." The trial court denied the instruction. The convictions and this appeal followed.

ANALYSIS

I. Sufficiency

Horne argues that the trial court erred in denying his motions to strike as to the three alleged offenses because the evidence presented was insufficient to permit a reasonable trier of fact to conclude that he acted with malice in causing the discharge of the firearm within the residence. He argues that without malice, no charges of aggravated malicious wounding, malicious wounding, and maliciously shooting in an occupied building can be established; then he asserts if those charges fail, there can be no conviction for use of a firearm while committing a felony. Horne contends that the Commonwealth bore the burden of establishing beyond a reasonable doubt that, at the moment the shot was fired, he was acting with malice.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan*, 72 Va. App. at 521 (alteration in original) (quoting *Smith*, 296 Va. at 460). In challenging the judgment, appellant argues that his act was in a heat of passion, which is mutually exclusive to malice. Horne states that "he had every reason to be both fearful and enraged just prior to the confrontation between the two men. Perry was an armed intruder, who had forcibly entered in the nighttime into a residence where the Appellant was residing, even if only for the night."

- 6 -

"Malice inheres in the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will. It may be directly evidenced by words, or inferred from acts and conduct which necessarily result in injury." *Hernandez v. Commonwealth*, 15 Va. App. 626, 631 (1993) (citations omitted)). Code § 18.2-51.2 provides in relevant part that:

> If any person maliciously shoots, stabs, cuts or wounds any other person, or by any means causes bodily injury, with the intent to maim, disfigure, disable or kill, he shall be guilty of a Class 2 felony if the victim is thereby severely injured and is caused to suffer permanent and significant physical impairment. . . .

A conviction for either aggravated malicious wounding or malicious wounding under Code §§ 18.2-51 and 18.2-51.2, requires the Commonwealth to prove that the appellant inflicted the victim's physical injuries "maliciously and with the intent to maim, disfigure, disable or kill." *Campbell v. Commonwealth*, 12 Va. App. 476, 483 (1991) (en banc).

As the trial court instructed the jury, the elements of the offense of maliciously shooting in an occupied building are:

> (1) That the defendant discharged a firearm within a building occupied by one or more persons; and (2) That the life or lives of such person or persons were endangered; and (3) That the act was done with malice.

*See* Code § 18.2-279. Likewise, the elements of use of a firearm in commission of a felony in this case required that the evidence establish:

> (1) That the defendant used a firearm; and (2) That the display, use or attempted use, was while committing or attempting to commit aggravated malicious wounding or the lesser included offense of malicious wounding.

*See* Code § 18.2-53.1.

In this case, there is sufficient evidence to show Horne acted with malice. There is also sufficient evidence to reject Horne's heat of passion claims. "[H]eat of passion and malice are mutually exclusive" and "[w]hether violence was completed in the heat of passion and due to a

reasonable provocation is generally a question for the fact finder." *Washington v. Commonwealth*, 75 Va. App. 606, 619 (2022).

"Malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed a purposeful and cruel act without any or without great provocation." *Branch v. Commonwealth*, 14 Va. App. 836, 841 (1992). "Malice may be inferred from the 'deliberate use of a deadly weapon unless, from all the evidence, [there is] reasonable doubt as to whether malice existed.'" *Fletcher v. Commonwealth*, 72 Va. App. 493, 507 (2020).

Viewing the evidence in the light most favorable to the Commonwealth, the evidence shows Horne had the firearm out when Perry reached the top of the stairs, called him a "pussy," and "busted" Perry's lip, before shooting him. Any verbal exchanges between Perry and Murphy do not constitute provocation sufficient to support the heat of passion defense. *Washington*, 75 Va. App. at 620. Perry stated that he was attacked by Horne and never drew his weapon. Furthermore, Horne testified in his own defense at trial; the jury, sitting as factfinder, "is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Speller v. Commonwealth*, 69 Va. App. 378, 388 (2018).[2] Perry's description of events plainly established malice and, essentially, an ambush.

On this record, we cannot conclude that the trial court erred in denying Horne's motion to strike as to the three alleged offenses because the evidence presented was sufficient to permit a reasonable trier of fact to conclude that Horne acted with malice.

## II. The Castle Doctrine Instruction Issue

Horne asserts that he was entitled to a Castle Doctrine instruction in addition to the self-defense instruction the trial court granted. If Horne's testimony is believed, an uninvited intruder

---

[2] For example, Horne's claim that Perry was shot with the gun he was carrying was flatly rebutted by ballistics testimony.

entered the house at night and Horne stood his ground to stop him, resulting in a tussle in which Perry's gun unexpectedly went off, paralyzing Perry.

The Commonwealth claims that Horne received the proper self-defense instruction to which he was entitled.

> If you believe that the defendant was without fault in provoking or bringing on the fight, and you further believe that: 1) he reasonably feared, under the circumstances as they appeared to him, that he was in imminent danger of bodily harm; and 2) he used no more force, under the circumstances as they appeared to him, than was reasonably necessary to protect himself from the perceived harm, then he acted in self-defense, and you shall find the defendant not guilty.

In addition, the jury was instructed:

> A person who reasonably believes that another intends to attack him for the purpose of killing him or doing him serious bodily harm has a right to arm himself for his own necessary self-protection. In such a case, no inference of malice can be drawn from the fact that he armed himself.

The Commonwealth asserts that these instructions fully encompass Horne's defense and that Horne was not entitled to a Castle Doctrine instruction under his version of the facts: an accidental shooting. Finally, the Commonwealth contends that the specific Castle Doctrine instruction tendered by Horne was not proper under the facts of this case.

A. The Castle Doctrine in Virginia

Virginia has long recognized that an individual has the right to defend himself in his home:

> In the early times our forefathers were compelled to protect themselves in their habitations by converting them into holds of defense: and so the dwelling house was called the castle. To this condition of things, the law has conformed, resulting in the familiar doctrine that while a man keeps the doors of his house closed, no other may break and enter it, except in particular circumstances to make an arrest or the like—cases not within the line of our present exposition. From this doctrine is derived

another: namely, that the persons within the house may exercise all needful force to keep aggressors out, even to the taking of life.

*Fortune v. Commonwealth*, 133 Va. 669, 687 (1922) (distinguishing between an invited guest and one that enters forcefully) (citation omitted), *cited with approval in Hines v. Commonwealth*, 292 Va. 674, 679-80 (2016).

The common law Castle Doctrine embodies two distinct legal principles. First, the doctrine provides that "persons within the home" or curtilage have no duty to retreat and "may exercise all needful force," including deadly force, to prevent an intruder from wreaking havoc. *Fortune*, 133 Va. at 687. Under that rule, deadly force is only permissible, however, if the intruder is "trespass[ing]" and it is "necessary to prevent a felonious destruction of [the homeowner or tenant's] property or the commission of a felony therein." *Bausell v. Commonwealth*, 165 Va. 669, 688 (1935); *see also Fortune*, 133 Va. at 687 (holding that the doctrine does not apply if the decedent was peaceably present in the home or curtilage under an implied license). Second, the Castle Doctrine provides that one attacked in his own home or its "curtilage," if "free from fault," has no duty to retreat and may use reasonable force, including deadly force, to eject or subdue the attacker. *Fortune*, 133 Va. at 686; *see also Hines*, 292 Va. at 681 ("[W]hen a party is assaulted in his own home, that party, as a homeowner (or tenant, as the case may be), has the right to use whatever means necessary to repel the aggressor, 'even to the taking of life.'" (quoting *Fortune*, 133 Va. at 687)).[3]

---

[3] Virginia law recognizes two forms of self-defense involving homicides: self-defense without fault ("justifiable self-defense") and self-defense with fault ("excusable self-defense"). "Justifiable homicide in self-defense occurs where a person, without any fault on his part in provoking or bringing on the difficulty, kills another under reasonable apprehension of death or great bodily harm to himself." *Bailey v. Commonwealth*, 200 Va. 92, 96 (1958). "In such a case, the defendant need not retreat, but is permitted to stand his ground and repel the attack by force, including deadly force, if it is necessary." *Foote v. Commonwealth*, 11 Va. App. 61, 67 (1990) (quoting *McCoy v. Commonwealth*, 125 Va. 771, 775 (1919)). Conversely, "[e]xcusable homicide in self-defense occurs where the accused, although in some fault in the first instance in provoking or bringing on the difficulty, when attacked retreats as far as possible, announces his

We note that the amount of force that may be used against a trespasser is not without limits. It is well-established that "[f]or a mere trespass upon land, the owner has no right to assault the trespasser with a deadly weapon, the result of which may be to kill him or do him great bodily harm." *Montgomery v. Commonwealth*, 98 Va. 840, 844 (1900); *see also Pierce v. Commonwealth*, 135 Va. 635 (1923) (finding that use of a trap gun to protect a store would justify a finding of second-degree murder). Additionally, a defendant could not use the Castle Doctrine as a shield against prosecution for using deadly force against a toddler who had wandered uninvited into the home.

B. The Trial Court Did Not Err in Rejecting Horne's Proffered Instruction

The Commonwealth asserts that it was not error for the trial court to reject Horne's Castle Doctrine instruction because the self-defense instructions he received adequately covered his defenses, and also because such an instruction is inappropriate where a shooting is "accidental" or unintended. Because of the posture of the case, we do not need to address the Commonwealth's contentions relating to Horne's entitlement to a Castle Doctrine instruction.

For purposes of our analysis, we will assume without deciding that Horne was entitled to a Castle Doctrine instruction.[4] Horne's rejected Castle Doctrine instruction stated, in its entirety, that "when a party is assaulted in his own home, that party as a homeowner or tenant, as the case may be, has a right to use whatever means necessary to repel the aggressor even to the taking of life." Horne argues, citing *Hines*, 292 Va. at 679, that the "language of the rejected instruction was taken from a recent Virginia Supreme Court decision and states a correct principle of law."

---

desire for peace and kills his adversary from a reasonably apparent necessity to preserve his own life or save himself from great bodily harm." *Id.*

[4] Much of Horne's testimony was hotly contested. Nonetheless, as noted above for purposes of analyzing Horne's entitlement to an instruction, we view the evidence in best light to him. *Pena Pinedo*, 300 Va. at 18.

Virginia courts "have frequently cautioned against 'the danger of the indiscriminate use of language from appellate opinions in a jury instruction'"—and for good reasons. *Shaikh v. Commonwealth*, 276 Va. 531, 546 (2008) (quoting *Clohessy v. Weiler*, 250 Va. 249, 255 (1995)). Indeed, "[u]nless clearly intended for use as a jury instruction, such language is inappropriate for that purpose." *Id.*; *see National Union Fire Ins. Co. v. Bruce*, 208 Va. 595, 601 (1968).

A literal interpretation of Horne's snippet of case language could lead to chaotic results. The proposed instruction permits the use of virtually unlimited force without addressing who the "homeowner" may attack or whether the "homeowner" must be free from fault in causing the confrontation. Moreover, by simply labeling the recipient of the repelling attack as "the aggressor," the instruction does not require that the "aggressor" be an intruder or uninvited guest. It could be a friend or neighbor or anyone who is properly in the house—including the father of three children who reside in the home who was invited to be there by the owner, Murphy (which is what Perry purported to be).

In short, while the snippet of case law may be a correct statement of law in the context of a blameless homeowner and a dangerous, unknown intruder—standing alone without reference to blame or any right to be present—the language is confusing, misleading and problematic here.[5] Moreover, even in best light to Horne, he put on no evidence that he was the "homeowner" or a "tenant" at Murphy's home—and these are the only terms used in the instruction to describe Horne. Horne clearly did not own the property. He was not a tenant—nor did he offer an instruction defining a tenant. Thus, the instruction that Horne offered was inappropriate in this setting. *Craig v. Commonwealth*, 34 Va. App. 155, 164 (2000) ("An

---

[5] Indeed, standing alone it would justify lethal force among co-residents or siblings living under one roof. Taken literally the instruction would allow a host to use lethal force on a drunken, invited party guest who pushes the host.

instruction is properly refused when it is unsupported by the evidence."); *Lynn v. Commonwealth*, 27 Va. App. 336, 346 (1998) (same).[6]

We conclude that Horne's proffered instruction, standing alone, was not supported by the evidence in this case. *Pena Pinedo*, 300 Va. at 121-22. Accordingly, the trial court did not abuse its discretion when it rejected Horne's proposed Castle Doctrine instruction.

CONCLUSION

The judgment of the trial court is affirmed as to the sufficiency of the evidence to support Horne's convictions. We also uphold the trial court's decision to reject Horne's proposed instruction on the Castle Doctrine.

*Affirmed.*

---

[6] The Commonwealth suggests that, at best, Horne was an "authorized occupant" (*see* Code § 55.1-1200); however, he plainly did not fit either of the terms "homeowner" or "tenant" —the criteria contained in his instruction. We note that the Castle Doctrine may apply to a resident of a home who is neither homeowner nor tenant. *See, e.g.*, *Beard v. United States*, 158 U.S. 550, 559-60 (1895) (finding no duty to retreat for an accused attacked "on his own premises, near his dwelling house" when those premises "constitut[ed] a part of his residence and home"); *Fortune*, 133 Va. at 686-87 (applying the Castle Doctrine to one attacked "in his own curtilage" or "within his own home," and noting that one need not retreat if attacked "in his dwelling"). However, in this case the language of Horne's proposed instruction was not broad enough to encompass such a situation.