COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Huff,* Ortiz and Raphael
Argued at Norfolk, Virginia


DONTE DEMILLE HAMPTON

                                            MEMORANDUM OPINION** BY
v.        Record No. 1842-23-1               JUDGE DANIEL E. ORTIZ
                                               MARCH 11, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Bonnie L. Jones, Judge

Paul C. Galanides for appellant.

Brooke I. Hettig, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury convicted Donte Hampton of malicious wounding, attempted malicious wounding,

two counts of use of a firearm in the commission of a felony, shooting inside an occupied

dwelling, and conspiracy to shoot inside an occupied dwelling. Hampton asserts that the trial

court erred by refusing his proposed jury instruction on the lesser-included offense of assault and

battery; by granting the Commonwealth's proposed jury instructions on the duty to retreat and

flight from the crime scene; by finding the evidence sufficient to support his malicious wounding

conviction; and by refusing to admit a certificate of analysis at trial. Finding no error in the trial

court, we affirm.

---

* Judge Huff participated in the hearing and decision of this case prior to the effective
date of his retirement on December 31, 2024.

** This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[2]

Kwama Kenyatta ("Kwama") lived in a two-bedroom apartment in the City of Hampton with his roommate, Kiana Royal. Kwama and Royal's relationship was strictly platonic. One morning at around 2:00 a.m., Hampton carried Royal into the apartment after a night of drinking. Royal was "passed out," and "burping," with "her eyes rolling back," and she appeared to be intoxicated. Hampton handed Royal to Kwama, who carried her to her bedroom and laid her down.

Hampton went outside to move his vehicle but returned a few minutes later and "walked straight into [Royal's] room." Because Kwama did not know Hampton, he "took pause for a second" and then knocked on Royal's bedroom door to check on her. Hampton opened the door and said he was staying there. Shortly after Hampton closed the door, Kwama heard what sounded like "intercourse noises and moaning coming from [Royal's] bedroom."

Kwama found the situation "startling" because Royal was unconscious when he laid her on the bed moments before. Kwama was "a little bit scared" and "not sure" what to do, so he "knocked on the door again and . . . asked [Hampton] . . . [']what the fuck are you doing?[']" The conversation that followed was "very unsettling." Hampton ordered Kwama back to his room, yelled that he was going to "air this bitch out," and claimed that he could "get niggas to come fuck [Kwama] up." Hampton offered to go outside with Kwama "right now" if he wanted, to which Kwama responded, "[I]f you go outside, I'm going to lock that door in your goddam face and you can sit outside and yell." Hampton replied that he would "kick that bitch in." Kwama then told Hampton "you gotta get . . . out of here." But instead of leaving, Hampton

---

[2] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Meade v. Commonwealth*, 74 Va. App. 796, 802 (2022) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). "[W]e regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence." *Id.*

"slammed the door in [Kwama's] face and went right back to doing what he was doing."

Kwama explained that to "air this whole bitch out" means "[g]etting shot. Poking me full of holes." He interpreted Hampton's statement as a death threat.

After Hampton slammed the door, Kwama yelled at Royal to "wake up." Royal eventually came to the bedroom door "stumbling," as she could not "stay on her feet." Royal told Kwama to go back to his room and said, "It's okay." Leaning over Royal, Kwama said to Hampton, "Look, bro, you can come back tomorrow. You don't have to be here right now. Wait till she's better. She'll wake up in the morning." Hampton responded: "Nah, bro. Stop fucking disrespecting me . . . I'll kill you . . . I'll air this bitch out." Royal and Hampton then shut the bedroom door.

Kwama called his twin brother, Kwame, explained what was happening, and asked him to come over, so Kwame armed himself and arrived about an hour later. The brothers decided to talk to Hampton again to find out whether he was going to have somebody come kill Kwama. During their conversation, Hampton said he "wanted to be sure that [Kwama and Kwame] knew that he was not a bitch and that [they] were some pussies . . . and he wasn't scared about shit about [them], . . . and he wanted to reiterate to [Kwame] that he could have this bitch aired out if he wanted to," and that "he's done [it] before." Hampton ended the conversation by again warning Kwama not to disrespect him.

Hampton went back to Royal's room and Kwama was "not sure at that point whether or not somebody was going to come and hurt [him]." Therefore, Kwama called the police and arranged to meet them at the apartment complex's leasing office. Kwama asked the police to remove Hampton from the apartment "at least for threatening to kill [him]." Unfortunately, the conversation with the police did not "lead to anything productive."

Around midday, Kwama left the apartment for church while Kwame remained at the apartment. Due to the situation, Kwama planned to move out the next day. After church, Kwama returned to the apartment "because [Kwame] . . . wasn't answering the phone, and it scared" Kwama. Kwama also invited two neighbors over to the apartment to hang out. When Kwama explained "the situation" to his friends, they became fearful.

Eventually, Royal warned Kwama's friends by text that they "need[ed] to leave right now. It's about to get turned up in here." Kwama's friends left, but Kwama and Kwame remained in the apartment. Kwama attempted to communicate with Royal to ask what was going on. Through the door, Kwama heard Hampton and Royal on the phone talking with someone and giving them an address. Kwama was "confused" and "scared" because he "didn't know if they were talking to the police or friends or whoever." Five to ten minutes later, Kwama received a phone call from his friend, who warned him that "[t]here w[ere] people outside [Kwama's] apartment with guns in their hands." Kwama then "saw two men outside with firearms in their hands, smiling, pacing back and forth in front of [his] doorway."

After Kwama and Kwame learned about the men outside, they armed themselves with guns. Hampton exited Royal's bedroom and said, "Y'all about to die today." Kwama began telling Hampton "I'm sorry . . . You ain't got to do this. Please, don't." But Hampton responded: "Nah, you dead. You're dead. You about to die right now." Hampton then walked to the door and let the two, armed men into the apartment. Hampton told the two men to "come in and kill [Kwama and Kwame]."

At trial, Royal testified that the men entered the apartment "aggressive[ly]" and that she saw one of them with a gun. Royal left the apartment as the men quickly entered. As Royal left, she heard what "sounded like a thousand" gunshots. Indeed, Hampton had retrieved a gun from one of the two men, and all three fired at Kwama and Kwame, who ran to Kwama's bedroom

- 4 -

and "tried barricading the door." Kwame locked the door, and Kwama used his arms to hold the door, all the while begging for their lives. While Kwama was "crying [his] . . . eyes out," the armed men were laughing.

Hampton directed his two friends: "When you kick that motherfucking door down, light those niggas up." The men began "ramming" the door. As Kwama blocked the door with his body, the door started to crack. A bullet came through the door and tore through his arm. Another bullet grazed Kwama's head. As the door cracked apart, Hampton and the other two gunmen "just kept shooting and shooting, and . . . pushing each other through the hallway, and . . . trying to kill" Kwama and Kwame. Both Kwama and Kwame testified that they saw Hampton holding a gun and shooting at them along with the other men. Kwama did not know what to do, so he fired at the gunmen through the cracked door, which was by now "riddled with bullets," killing one of Hampton's friends and wounding the other. Hampton was not hit.

When the shooting stopped, Kwama saw through the broken door that Hampton was "in the hallway on his friend's body, shaking it, asking him to get up." He was also "digging through his friend's pockets." When the gunman did not get up, Hampton retrieved a gun from off the floor and left. Through the window, Kwame saw Hampton approach the other gunman, who had fallen into the grass outside of the apartment. Hampton bent down and then made a gesture toward the curb before he took off running again. A police officer subsequently recovered a pistol from the storm sewer near where Hampton made the throwing gesture.

At the conclusion of the Commonwealth's case-in-chief, Hampton moved to strike the charges, citing inconsistencies and a lack of credibility in Kwama's and Kwame's testimonies. Hampton also argued that there was no credible evidence that he held a weapon until he picked up a firearm from the friend who was fatally shot in the hallway or that he ever fired a weapon in

the apartment. Hampton asserted that Kwama was the main "instigator" and insisted he did nothing to provoke the shooting. The trial court denied the motion to strike.

Before trial, the Commonwealth notified Hampton of its intent to admit a DNA certificate of analysis generated by the Department of Forensic Science ("DFS"), under Code § 19.2-187.1. Hampton objected to the admission of the certificate without the person who performed the analysis being present to testify at trial. Because the analyst no longer worked for DFS at the time of trial, the Commonwealth was unable to subpoena him and did not therefore admit the certificate. Following the motion to strike, the Commonwealth raised a preemptory objection to Hampton's stated intention to introduce the certificate in his case-in-chief. The prosecutor explained that Hampton had not given the Commonwealth notice of his intent to introduce the certificate, nor had he subpoenaed the analyst who prepared the certificate of analysis for trial.

Hampton responded that since the Commonwealth had given notice of its intent to introduce the certificate but had not done so, he was entitled to admit the evidence under "the spirit of the law." In other words, notwithstanding his objection to the admission of the certificate without the presence of the analyst at trial, Hampton argued that the Commonwealth had actual notice of his intent to rely upon it and thus sought to introduce it in his case-in-chief without calling a witness. Citing the absence of a witness to introduce the evidence, the trial court sustained the Commonwealth's objection and prohibited Hampton from introducing the certificate of analysis.

Hampton called only one witness, Detective Snelgrow, in his case-in-chief. He then unsuccessfully renewed his motion to strike.

Before closing arguments, Hampton sought an instruction on misdemeanor assault and battery as a lesser-included offense to malicious wounding. The trial court denied that instruction. Hampton also argued that the Commonwealth's proposed instruction advising that

Kwama had no duty to retreat was error because the evidence indicated that he was the aggressor, and he maintained that a flight from the scene instruction was improper because he had no duty to remain in a situation where he might be shot. Finding that Kwama "at no time had a duty to retreat from [his] premises," the trial court granted the instruction on the duty to retreat, and finding that Hampton's escape from the scene was a circumstance the jury could consider, the trial granted the flight instruction.

Following closing arguments, the jury convicted Hampton of malicious wounding, attempted malicious wounding, two counts of use of a firearm in the commission of a felony, shooting into an occupied building, and conspiracy to shoot in an occupied building. Hampton was sentenced to 38 years' imprisonment with 28 years suspended and subsequently noted this appeal.

## ANALYSIS

### I. Jury Instructions

"A trial court 'has broad discretion over whether to give or deny proposed jury instructions.'" *Taylor v. Commonwealth*, 77 Va. App. 149, 166 (2023) (quoting *Huguely v. Commonwealth*, 63 Va. App. 92, 129 (2014)). "A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). "[W]hile a defendant is entitled to have the jury instructed on his theory of the case, such an instruction must be supported by '[m]ore than a scintilla of evidence.'" *Mayberry v. Commonwealth*, 66 Va. App. 93, 101 (2016) (second alteration in original) (quoting *Eaton v. Commonwealth*, 240 Va. 236, 255 (1990)). "The weight of the credible evidence that will amount to more than a mere scintilla . . . is a matter to be resolved on a case-by-case basis." *Id.* (alteration in original) (quoting *Woolridge v. Commonwealth*,

29 Va. App. 339, 348 (1999)). "Upon review, the evidence must be viewed in the light most favorable to the proponent of the instruction." *Id.*

Hampton argues that the trial court erred by failing to instruct the jury on the lesser-included offense of assault and battery and by granting the Commonwealth's proposed instructions on the duty to retreat and flight from the crime scene. We find no error in the trial court's rulings on the proffered instructions.

## A. Assault and Battery Instruction

"[W]hen [a] proposed jury instruction touches upon a lesser-included offense and there is any credible evidence in the record to support the instruction, 'failure to give the instruction is reversible error.'" *Williams v. Commonwealth*, 64 Va. App. 240, 247 (2015) (quoting *Brandau v. Commonwealth*, 16 Va. App. 408, 412 (1993)). "Conversely, '[i]f the evidence is sufficient to support "a conviction of the crime charged, and there is no *independent* evidence warranting a conviction [of the lesser-included offense], an instruction on the lesser-included offense need not be given."'" *Id.* (alterations in original) (quoting *Commonwealth v. Vaughn*, 263 Va. 31, 36 (2002)). In other words, a trial court is not *always* required to grant a proposed instruction on a lesser-included offense. *Commonwealth v. Leal*, 265 Va. 142, 146 (2003). The giving of such an instruction is only required where the lesser-included offense is supported by "*affirmative evidence*" in the record and not merely on the jury's ability to reject uncontroverted evidence. *Id.* at 147 (emphasis added) (quoting *Vaughn*, 263 Va. at 37). "[A]lthough the jury's ability to reject evidence will support an acquittal, the ability to reject evidence does not supply the affirmative evidence necessary to support a jury instruction." *Vaughn*, 263 Va. at 37.

To prove malicious wounding under Code § 18.2-51, the Commonwealth must establish beyond a reasonable doubt that the defendant "wound[ed] or injure[d] a victim 'with the intent to maim, disfigure, disable, or kill' him." *Williams*, 64 Va. App. at 248 (quoting Code § 18.2-51).

The defendant must "intend to permanently, not merely temporarily, harm another person." *Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013) (quoting *Johnson v. Commonwealth*, 53 Va. App. 79, 101 (2008)). "If the defendant acts with malice, he is guilty of malicious wounding, a Class 3 felony." *Williams*, 64 Va. App. at 248. And "[m]alice may be inferred from the 'deliberate use of a deadly weapon unless, from all the evidence, [there is] reasonable doubt as to whether malice existed.'" *Fletcher v. Commonwealth*, 72 Va. App. 493, 507 (2020) (second alteration in original) (quoting *Strickler v. Commonwealth*, 241 Va. 482, 495 (1991)). Assault and battery is a lesser-included offense of malicious wounding. *Witherow v. Commonwealth*, 65 Va. App. 557, 570 (2015). "While a conviction for assault and battery cannot stand without evidence showing 'an intention to do bodily harm . . . an intent to maim, disfigure or kill,'" and malice, are "unnecessary to the offense." *Id.* (quoting *Boone v. Commonwealth*, 14 Va. App. 130, 133 (1992)).

Here, Hampton argues that he was entitled to a lesser-included assault and battery instruction. Thus, the question is whether there is "independent," "affirmative evidence" in the record to show that, when Hampton fired a deadly weapon, he acted merely with an "intention to do bodily harm," rather than "an intent to maim, disfigure, or kill."

Hampton argues that the purported threats he made upon Kwama and Kwame's lives were "ambiguous" and that although "Kwama believed he was shot, . . . there was no [discreet] evidence demonstrating how he received his arm injury or the grazing wound to his head." Hampton concludes that the jury could have found Kwama's injuries "resulted from physical contact [with the door] and not a gunshot." We disagree.

The evidence proved that during several "unsettling" conversations over the course of the morning and into the afternoon, Hampton repeatedly demanded respect, assailed Kwama with profane and insulting language, and threatened to "air this bitch out," before inviting his friends to the apartment and instructing them to "come in and kill" Kwama and Kwame. In fact, before letting

his friends in, Hampton told the two brothers that they were going "to die right now." As Kwama and Kwame ran to Kwama's bedroom, Hampton instructed his two friends to take care of it and yelled for them to kick the door down and "light those niggas up." Both Kwama and Kwame testified that as they hid behind the bedroom door, the shooters attempted to break it down and then riddled it with a barrage of bullets. Kwama testified that one of those bullets came through the door and tore through his arm, and Kwame observed a bullet graze Kwama's head. Any reasonable fact finder could conclude from this testimony that Hampton's actions were malicious, that he intended to maim, disfigure, disable, or kill Kwama, and that Kwama was injured by flying bullets.

While there is ample evidence to support a finding of malice, contrary to Hampton's assertion, there is no "independent," "affirmative evidence" in the record to show that Hampton acted without that intent. *Williams*, 64 Va. App. at 247 (quoting *Vaughn*, 263 Va. at 36); *Leal*, 265 Va. at 147 (quoting *Vaughn*, 263 Va. at 37). For the trial court to have abused its discretion in denying the lesser-included assault and battery instruction, the evidence must have supported an inference either that Hampton acted without the requisite intent for malicious wounding or that Kwama was injured by something other than gunfire. But the evidence simply does not support an inference that Kwama's injuries to the arm and head resulted from his physical contact with the bedroom door, rather than from the gunfire, as Hampton argues. And there is no independent evidence suggesting that, when Hampton fired his weapon, he did so with anything less than an intent to maim, disfigure, or kill Kwama, such as an intent to scare. *Cf. Witherow*, 65 Va. App. at 570 (finding that an assault and battery instruction was warranted when defendant testified at trial that he intended to "scare" the victim by firing a gun). Thus, because no affirmative evidence in the record supported granting an assault and battery instruction, the trial court did not err by refusing it.

B.  Castle Doctrine[3]

Hampton asserts that the trial court erred by instructing the jury that Kwama "had no duty to retreat."  However, while the record indicates that the trial court granted the Commonwealth's instruction on the Castle doctrine, the court neglected to read the granted instruction to the jury.  The record therefore fails to support Hampton's assertion that the trial court abused its discretion by instructing the jury that Kwama had no duty to retreat.  Although the Commonwealth alluded to the purported Castle doctrine instruction during its closing argument by claiming that Kwama "was not required to remove himself from the threat of danger . . . in his own home," Hampton did not object to that argument, nor does it appear that he noticed the trial court's failure to read the instruction to the jury.  Moreover, the jury instruction was not included in the record, which prohibits our ability to assess it for legal accuracy.  Accordingly, because we do not find the alleged error in the record, we will not consider the merits of Hampton's legal argument on appeal.  *See Teleguz v. Commonwealth*, 273 Va. 458, 471 (2007); Rule 5A:20(c).

C.  Flight from the Scene of the Crime

"[A] defendant's 'acts to escape, or evade detection or prosecution for criminal conduct may be evidence at a criminal trial[] and a jury may be instructed that it could consider such acts.'" *Graves v. Commonwealth*, 65 Va. App. 702, 709 (2016) (second alteration in original) (quoting *Turman v. Commonwealth*, 276 Va. 558, 564 (2008)).  Flight evidence can be considered by the jury "along with other pertinent facts and circumstances" tending to establish guilt, *Hope v. Commonwealth*, 10 Va. App. 381, 386 (1990) (en banc), and the jury can give flight evidence "whatever weight it deems proper under the circumstances," *Graves*, 65 Va. App. at 709.  The

---

[3] The "'Defense of the Castle' doctrine provides that 'a man is not obliged to retreat if assaulted in his dwelling, but may use such means as are absolutely necessary to repel the assailant . . . even to the taking of life.'" *Hines v. Commonwealth*, 292 Va. 674, 680 (2016) (alteration in original) (quoting *Fortune v. Commonwealth*, 133 Va. 669, 687 (1922)).

"'flight' is the action of the alleged offender *after* the commission of the crime, not the crime itself." *Id.* So, a flight instruction that properly states the law is "appropriate when the evidence supports it, depending on the case and its relation to the charged offense." *Id.*

Here, the trial court instructed the jury as follows:

> If a person leaves the place where a crime was committed to avoid prosecution, detection, apprehension or arrest, this creates no presumption that the person is guilty of having committed the crime. However, it is a circumstance which you may consider along with the other evidence.

This instruction was proper because the evidence supported a reasonable inference that Hampton fled the apartment after the shooting specifically to avoid apprehension or arrest. After a night of intense acrimony between the parties, Hampton summoned his friends to the apartment specifically to kill Kwama and Kwame. After the shooting stopped, Hampton collected a weapon from the ground, and then Kwame saw Hampton approach his other friend, who was lying in the grass outside, and bend down before making a throwing motion toward the curb and *running away*. Police recovered a pistol from the storm sewer nearby, creating an inference that Hampton attempted to conceal evidence. Hampton did not stay on scene, he did not seek assistance for his friends, and he did not wait for the police. Instead, he left Kwama and Kwame, the only two witnesses to the shooting, at the apartment and departed. In other words, the evidence supports a conclusion that he fled the scene to avoid prosecution, detection, apprehension, or arrest.

Because there was more than a scintilla of evidence to support the Commonwealth's proposed instruction on flight, the trial court did not err in overruling Hampton's objection to the instruction.

## II. Sufficiency of the Evidence

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The

judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)). Instead, the only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Burrous v. Commonwealth*, 68 Va. App. 275, 279 (2017)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Hampton claims that the evidence failed to support his conviction for malicious wounding because the Commonwealth failed to prove that he used or possessed a weapon during the exchange of gunfire. The record refutes that assertion. Indeed, both Kwama and Kwame testified unequivocally at trial that Hampton held a firearm and shot at them along with the other two gunmen, and in the absence of any evidence to the contrary, the jury was entitled to rely on that testimony. "The sole responsibility to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from proven facts lies with the fact finder."

- 13 -

*Blankenship v. Commonwealth*, 71 Va. App. 608, 619 (2020) (quoting *Ragland v. Commonwealth*, 67 Va. App. 519, 529-30 (2017)). Moreover, "[t]he conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only when we find that the witness'[s] testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000) (quoting *Fisher v. Commonwealth*, 228 Va. 296, 299 (1984)). Given that their respective eye-witness accounts were supported by a substantial amount of corroborating evidence at trial, there was nothing inherently incredible about Kwama and Kwame's version of events.

Additionally, the jury was instructed that Hampton could be found guilty either as a principal in the first, or as a principal in the second degree. "A principal in the first degree is the actual perpetrator of the crime." *Thomas v. Commonwealth*, 279 Va. 131, 156 (2010) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 482 (2005)). A "principal in the second degree . . . is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime." *Id.* (quoting *Muhammad*, 269 Va. at 482). "To hold the accused accountable as a principal in the second degree, the Commonwealth must prove the accused was 'present, aiding and abetting, by helping some way in the commission of the crime.'" *Washington v. Commonwealth*, 43 Va. App. 291, 306 (2004) (quoting *Ramsey v. Commonwealth*, 2 Va. App. 265, 269 (1986)). "It must be shown that the accused shared the criminal intent of the principal or 'committed some overt act in furtherance of the offense.'" *Id.* (quoting *Sutton v. Commonwealth*, 228 Va. 654, 666 (1985)).

Kwama and Kwame both testified that Hampton threatened to kill Kwama multiple times in the hours before the shooting, and Kwama heard Hampton and Royal giving someone an address only five or ten minutes before the two, armed men appeared outside his front door. Hampton allowed the gunmen entry and told Kwama and Kwame they were going to die now. He then instructed the two men to kill Kwama and Kwame and after Kwama and Kwame barricaded

- 14 -

themselves in Kwama's bedroom, Hampton shouted to his friends, "kick that motherfucking door down[ and] light those niggas up." "When the alleged accomplice is actually present and performs overt acts of assistance or encouragement, he has communicated to the perpetrator his willingness to have the crime proceed and has demonstrated that he shares the criminal intent of the perpetrator." *Carr v. Commonwealth*, 69 Va. App. 106, 114 (2018) (quoting *Rollston v. Commonwealth*, 11 Va. App. 535, 539 (1991)). That Hampton was physically present at the shooting, actively encouraging the two gunmen to shoot and kill Kwama and Kwame, and, in fact, orchestrated the entire event, supports the Commonwealth's theory that Hampton participated—at a minimum—as a principal in the second degree to the malicious wounding.

It follows that because the evidence proved that Hampton was responsible either as a principal in the first, or as a principal in the second degree to malicious wounding, the trial court did not err in denying Hampton's motion to strike that indictment.

### III. Certificate of Analysis

Determining the "'admissibility of evidence is within the discretion of the trial court,' and an appellate court will not reject such decision absent an 'abuse of discretion.'" *Williams v. Commonwealth*, 71 Va. App. 462, 487 (2020) (quoting *Tirado v. Commonwealth*, 296 Va. 15, 26 (2018)). "The abuse of discretion standard draws a line—or rather, demarcates a region—between the unsupportable and the merely mistaken, between the legal error . . . that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not." *Jefferson v. Commonwealth*, 298 Va. 1, 10-11 (2019) (alteration in original) (quoting *Reyes v. Commonwealth*, 297 Va. 133, 139 (2019)). "[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not reverse merely because it would have come to a different result in the first instance."

*Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (alterations in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)).

Code § 19.2-270.5 sets forth the notice requirement for admitting a DNA analysis in a criminal proceeding:

> At least 21 days prior to commencement of the proceeding in which the results of a DNA analysis will be offered as evidence, the party intending to offer the evidence shall notify the opposing party, in writing, of the intent to offer the analysis and shall provide or make available copies of the report or statement to be introduced. In the event that such notice is not given, and the person proffers such evidence, then the court may in its discretion either allow the opposing party a continuance or, under appropriate circumstances, bar the person from presenting such evidence.

In the instant case, Hampton sought, on the third day of the jury trial, to introduce the certificate of analysis under Code § 19.2-270.5. The Commonwealth objected because Hampton had not filed a notice of intent to introduce it and there was no witness through whom it could be introduced. The Commonwealth explained that the analyst who performed the analysis was no longer employed with DFS and his whereabouts were unknown. The Commonwealth had also previously informed Hampton of its inability to subpoena the analyst for trial. Thus, it was clearly within the trial court's sound discretion to exclude the DNA certificate of analysis, especially since Hampton failed to comply with the statute, could not secure the presence of the analyst at trial to testify, and because to rule it admissible would have necessitated a continuance three days into the jury trial.

Nevertheless, Hampton argues that the Commonwealth was on notice of his intent to admit the certificate because it had provided notice of its intent to admit the certificate before trial. Hampton argues that "Code § 19.2-270.5 authorizes the introduction of the report when the opposing party is on notice and there is no objection lodged in response." He explains that

- 16 -

"[h]aving received notice of the Commonwealth's intent to introduce the certificate," he found no reason to "file a mirror notice under . . . Code § 19.2-270.5."

However, the Commonwealth never filed a notice of intent to introduce the certificate of analysis under Code § 19.2-270.5. Instead, the Commonwealth filed a notice of intent to offer the DNA certificate of analysis into evidence under Code § 19.2-187.1, which would have permitted the Commonwealth, absent objection by the defendant, to "offer a certificate of analysis into evidence in lieu of testimony." *See* Code § 19.2-187.1. Hampton objected to the admission of the certificate of analysis without a witness under § 19.2-187.1. Thus, Hampton failed to notify the Commonwealth before trial of his intention to admit DNA evidence at trial under § 19.2-270.5, and we reject his assertion that § 19.2-270.5 allows him to rely on the Commonwealth's notice of intent to admit a certificate of analysis under a separate statutory provision.

In sum, Hampton's failure to comply with the requirements of Code § 19.2-270.5 required the trial court to exercise its discretion and either exclude the certificate of analysis, or admit it but grant a continuance after the jury was seated and received three days of testimony. The trial court did not abuse its discretion by choosing to exclude the certificate of analysis.

CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*